## UNITED STATES
### v.
## McKESSON & ROBBINS, Inc.

United States District Court,
S. D. New York.

July 1, 1954.

Worth Rowley, Special Asst. to the Atty. Gen. (Allen A. Dobey, William F. Rogers, Washington, D. C., of counsel), for plaintiff.

Hodges, Reavis, McGrath, Pantaleoni & Downey, New York City (John P. McGrath, Denis B. Sullivan, Robert Thrun, Laurence C. Ehrhardt, New York City, of counsel), for defendant.

MURPHY, District Judge.

On this motion for summary judgment by plaintiff under Rule 56, Fed.Rules Civ. Proc., 28 U.S.C.A., in an action under Section 4 of the Sherman Act[1] seeking adjudication of illegality and injunction, a question of first impression in the courts is presented: Is a manufacturer, who is also a wholesaler and a limited retailer of his own products, as well as a wholesaler of products of other manufacturers, privileged to fix resale prices on his own products with competing wholesalers under federal fair trade statutes? Both the Miller-Tydings[2] and the McGuire[3] acts make lawful "contracts or agreements prescribing minimum \* \* \* prices, for the resale of a commodity which bears, or the label

1. Act of July 2, 1890, 26 Stat. 209, 15 U.S.C.A. § 4.

2. Act of August 17, 1937, 50 Stat. 693, 15 U.S.C.A. § 1. See Schwegmann Bros.

v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035.

3. Act of July 14, 1952, 66 Stat. 631–2, 15 U.S.C.A. § 45(2).

or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodites of the same general class produced or distributed by others, * * *." Both acts make this exception to the privilege in these terms:

"[Nothing quoted above shall] make lawful [any] contracts or agreements providing for the establishment or maintenance of minimum * * * resale prices on any commodity * * * between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other." [4]

On this motion it is plaintiff's contention that the "contracts or agreements providing for the establishment or maintenance of minimum * * * resale prices on any commodity", concededly made by defendant through its wholesale drug divisions with competing wholesalers, are ones "between wholesalers * * * or between persons, firms, or corporations in competition with each other." Consequently, not privileged under either fair trade act, they are illegal *per se* as price fixing agreements under the Sherman Act.

Defendant takes the position that the fair trade acts privilege vertical price fixing at different levels, between a manufacturer as seller and wholesalers as buyers, or at least between a manufacturer-wholesaler as seller and other wholesalers as buyers. The explicit exception to this privilege continues the Sherman Act prohibitions against horizontal price fixing by competitors at the same functional level. If this construction of the fair trade acts is not a valid one, defendant alternatively contends that genuine issues of material facts remain for resolution before plaintiff may prevail.

The facts, contested and conceded both in the pleadings and in the admissions of facts and answers to interrogatories by defendant, must be considered in order to determine whether or not the principal question posed may be summarily resolved without trial, and if so how.

Defendant is a corporation organized and existing under the laws of the State of Maryland and has its general offices in this judicial district where it transacts business. Defendant is one of the largest wholesalers of drug store merchandise in the United States. It conducts a nation-wide wholesale drug business, operating 74 wholesale drug divisions located in 35 states. Most of its wholesaled drug store merchandise consists of products manufactured, or supplied to it, by other concerns. In addition, at its plant at Bridgeport, Connecticut, the defendant itself manufactures a line of drugs, pharmaceuticals, cosmetics and toilet preparations, or "McKesson products." This case relates solely to restraints on the sale, resale, and distribution of the "McKesson" products manufactured by defendant.

In the conduct of its wholesale drug business the defendant sells drug store merchandise, including McKesson products, to drug stores and other retailers located throughout the United States, for resale to ultimate consumers, and in the conduct of its wholesale drug business the defendant's wholesale drug divisions compete with other wholesalers. The defendant also sells McKesson products through wholesalers other than its own wholesale divisions for resale to drug stores and other retailers.

Neither the defendant's manufacturing division located at Bridgeport, Connecticut, nor its 74 wholesale drug divisions located in 35 states, are separately incorporated.

Based on admissions and answers of the defendant its sales of McKesson products to other wholesalers fall into four categories: (1) sales of McKesson products by the manufacturing division of the defendant to wholesalers whose trading areas are substantially the same as those

---

4. 15 U.S.C.A. § 1; id. § 45(5).

of wholesale drug divisions of the defendant of whose trading areas, if not the same as those of wholesale drug divisions of the defendant, materially overlap the trading areas of the defendant's wholesale divisions; (2) sales of McKesson products by the manufacturing division of the defendant to other wholesalers whose trading territories do not substantially overlap the trading territories of the wholesale drug divisions of the defendant but in whose trading territories the manufacturing division of the defendant sells McKesson products direct to retailers; (3) sales of McKesson products by the wholesale drug divisions of the defendant to other wholesalers located in the same city or the same trading territory as a wholesale drug division of the defendant; (4) sales of McKesson products by the manufacturing division of the defendant and by the wholesale drug divisions of the defendant to a few wholesalers with respect to whom the present state of the record is inadequate to establish that the wholesaler competes with either the manufacturing division of the defendant or a wholesale drug division of the defendant.

With respect to category No. 1, although defendant's answer to the complaint denied "existence of substantial competition with other wholesalers with respect to McKesson products", subsequent answers to interrogatories disclosed sales of such products during the fiscal year 1951–2 by defendant's manufacturing division to such wholesalers amounting to $283,462. In an admission of facts, it is stated that "wholesale drug divisions of the defendant compete in the sale of McKesson products and other drug products with [such] wholesalers * * * in those places where the trading areas of such wholesalers overlap the trading areas of these wholesale drug divisions: New York, N. Y., Brooklyn, N. Y., Cairo, Illinois, Pittsburgh, Pa., Detroit, Mich., Huntington, W. Va., Akron, Ohio."

Under category No. 2, i. e., sales by defendant's manufacturing division to wholesalers in areas which do not overlap those traded in by defendant's wholesale division but in which sales are made by defendant's manufacturing division direct to retailers, defendant's answers to interrogatories indicate some sales under such conditions direct to retailers who were parties to defendant's manufacturer-wholesaler fair trade agreement.

In category No. 3 covering sales of McKesson products by defendant's wholesale division to wholesalers, defendant's answers to interrogatories indicate that its wholesale drug divisions were requested by a vice-president of the defendant in charge of drug merchandising, to forward to the manufacturing division a list of the wholesalers to whom they sold McKesson products, and the wholesale drug divisions were instructed not to sell McKesson products to any other wholesaler until they had word from the defendant's manufacturing division that such wholesaler had signed a fair trade contract on those products. The defendant's wholesale drug divisions complied with these instructions and forwarded to the manufacturing division a list of wholesalers, upon receipt of which the manufacturing division requested each such wholesaler to execute a fair trade contract with the manufacturing division of the defendant.

There were 73 such wholesalers located in the same city or near a city or town where defendant's wholesale drug division traded. The annual aggregate of such sales is estimated by defendant to be about $200,000.

Various forms of defendant's manufacturer-wholesaler and manufacturer-retailer fair trade agreements were used in connection with these sales. Defendant has admitted that in the conduct of its business as a drug manufacturer it sells and ships McKesson products in interstate trade and commerce to wholesalers and retailers of drug store merchandise. The defendant's wholesale drug divisions, except the ones in New York and Brooklyn, sell and ship McKesson products across state lines to retailer customers located in states other

than those from which sales and shipments are made.

Defendant contests proof of the existence of competition in three of these four categories. In category No. 1, defendant has admitted sales by its manufacturing division of $283,462 during the fiscal year 1951–52, to ten wholesalers who "compete in the sale of McKesson products and other drug products" with seven of defendant's wholesale divisions. This represents only 3 per cent of the total sales made to all wholesalers. Moreover, defendant insists that a "substantial portion of the sales" made by its seven wholesale divisions "was made in portions of their trading areas where no overlap existed." Consequently, defendant urges that an issue of fact remains whether this competition with ten wholesalers is "substantial or *de minimis*."

With respect to category No. 2, involving direct sales by defendant's manufacturing division, amounting to about $60,000, to sixteen retailers located in trading areas of twelve wholesalers of defendant's merchandise, defendant contends that such similarity of geography is insufficient to establish a *prima facie* case of competition.

The third category, relating to sales by various of defendant's wholesale divisions to other wholesalers in identical trading areas, are characterized by defendant as mere courtesy sales of small amounts of defendant's brand merchandise. Here again defendant contends that the metes and bounds of trading area is not determinative of the existence of competition because of possible variations in types of merchandise and services offered by each, or in the kind of customers served by each.

The major inquiry is to ascertain the intent of Congress in excluding from the privilege of fair trade, price fixing contracts or agreements "between wholesalers, * * * or between persons, firms, or corporations in competition with each other." If defendant was merely a manufacturer, and nothing more, no question concerning its right to the privilege of fair trade would be presented. If defendant was a wholesaler, and nothing more, there would still be the nice question of construction whether such agreements are unprivileged "between wholesalers", only if they are "in competition with each other", or unprivileged between them regardless of competition.

The heart of the problem presented arises from defendant's dual role as manufacturer and wholesaler. The language of the statute could provide an unerring guide to its speedy solution only if one of defendant's capacities is carefully considered and the other happily ignored. Defendant argues that fair trade agreements are made by its manufacturing division with other wholesalers; plaintiff, that defendant's manufacturing and wholesale divisions are parts of a single corporate entity. Examining the legislative history of the Miller-Tydings and McGuire Acts only confirms the observation of Mr. Justice Jackson with respect to the former statute: "I can think of no better example of legislative history that is unedifying and unilluminating than that of the Act before us." [5] During debate of the McGuire Act, one Senator expressed his view that "many producers of trade-marked items sell them to consumers, retailers, and wholesalers alike.

"Under the bill, such firms, may make resale price-maintenance contracts with both wholesalers and retailers because such contracts are vertical, that is, between sellers and buyers. While in one sense firms in this position function not only as producers but also as wholesalers and retailers, they may still lawfully make contracts with other wholesalers and retailers, when in making such contracts they act as producers of a trade-marked or branded commodity, rather than as wholesalers and retailers entering into forbidden horizontal resale

5. Concurring in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, at page 397, 71 S.Ct. at page 752.

price-maintenance contracts with other wholesalers or other retailers." [6]

Similar opinions were voiced by Representatives with respect to both Acts.[7] Yet our inquiry is not "what the legislator meant; we ask only what the statute means." [8] The peril of resorting to individual constructions of legislators is not merely that the mandate of the statute would cease to be embodied in its language and become unavailable as warning to the nation at large. It is also that such reviews may be no more than individual ones. As one Senator exclaimed with respect to the Miller-Tydings Act, "Regardless of the merits of this amendment, it is perfectly obvious that no 5 percent of the membership of the Senate will know anything whatever about the amendment when the Senate votes upon it. It is perfectly obvious that the Senate has reached the point of exhaustion in respect of the consideration of legislation; and if the Senate has any prudent consideration whatever for the country, instead of trying to do some of these intricate things it will quit and go home." [9]

The more carefully considered committee reports, unquestionably deserving weight in this dilemma, are replete with condemnation of "horizontal" and approbation of "vertical" fair trade arrangements.[10] None of these reports come to grips with the instant problem, squarely and unequivocally. Although not controlling here in any event, conflicting judicial and administrative opinion has suggested varying solutions of the problem.[11]

■ We reject the suggestion that either of alternate horns must be followed in the dilemma of fair trade agreements with independent wholesalers by a manufacturer who is also a wholesaler, just as much as we believe the labels "vertical" and "horizontal" can offer small solace in a situation where such agreements are capable of operative effect in both of these directions.[12] This court is unwilling, at this stage of case law development of legislatively sanctioned resale price fixing, to hold illegal *per se* fair trade agreements because the producer is also a wholesaler in the absence of showing some injury, inchoate or consummate, to competition. The legislature might well make such appraisal so as to push the line of liability back to the threshold of the bare agreement itself. In its halls the voices of many interests affected may be heard. A judicial forum, where but a few such interests may be weighed, must await the outcome of the patient process of case by case, trial and error method of settling disputes one at a time. Early in the common law housebreakers who entered with felonious intent were branded burglars, and the courts extended this with less severe punishment to attempts. Yet it remained for the legislature to make

6. 98 Cong.Rec. 8870, 1952.

7. Hearings before Committee on Interstate and Foreign Commerce on H.R. 5767, 82d Cong. 2d Sess., p. 13, Feb. 4, 1952; 81 Cong.Rec. 8141.

8. Holmes, Collected Legal Papers, 207.

9. 81 Cong.Rec. 7492, July 23, 1937.

10. Report No. 2053, Senate Committee on the Judiciary, May 12, 1936, p. 2; Report No. 257, Senate Committee on the Judiciary, March 29, 1937, p. 2; Report No. 382, House Committee on the Judiciary, March 11, 1937, p. 2; Report No. 879, Senate Committee on the District of Columbia, July 6, 1937, p. 6; Report of Conference Committee on H.R. 7472, 81 Cong.Rec. 8137, 8138, 1937; H.R.Rep.No.1437, Committee on Interstate and Foreign Commerce, 82d Cong. 2d Sess. 56, 1952; Sen.Rep.No. 1741, Committee on Interstate and Foreign Commerce, 82d Cong. 2d Sess., June 12, 1952.

11. See General Electric Co. v. S. Klein-on-the-Square, Inc., Sup.1953, 121 N.Y.S. 2d 37; Raxor Corp. v. Goody, Sup. 1953, 121 N.Y.S.2d 882; Matter of Eastman Kodak Co., Docket No. 6040, Oct. 9, 1953, CCH Trade Reg.Rep. at par. 11,527; Matter of Doubleday & Co., Inc., Docket No. 5897, F.T.C., Sept. 25, 1953, CCH Trade Reg.Rep. at par. 11,515; Eastman Kodak Co. v. Aljan Camera Co., Inc., Sup., 133 N.Y.S.2d 908.

12. Cf. Matter of Doubleday & Co., Inc., Docket No. 5897, F.T.C., Sept. 25, 1953, CCH Trade Reg.Rep. at par. 11,515.

the necessary appraisal to seal the doom of the man found in the street with picklock in his pocket.

Despite occasional contrary intimations,[13] direct price-fixing has been condemned as unlawful and an unreasonable restraint of trade without regard to the reasonableness of the prices fixed and irrespective of whether prices were actually raised or lowered.[14] While this has been an early judicial development, direct price-fixing had been condemned as illegal *per se* at common law prior to the Sherman Act.

But such threshold *per se* doctrine for direct price fixing hardly supports a similar one in fair trade situations absent a factual showing of illegality. The mischief of price fixing consists of the rigidity injected into the price structure which makes it unresponsive to normal pressures of supply and demand. Inflexibility inherent in fixation is an evil without regard to the reasonableness of the price. To permit private fixing would require constant judicial supervision of reasonableness and lead inevitably to the necessity of administrative price fixing by the government itself. To some extent similar mischief may attend direct price fixing by producers for wholesalers and retailers. Price competition on a single brand of merchandise is eliminated and not necessarily that occasioned by unrestrained price cutting and "loss leader" selling. Price reductions made possible by low cost store management, inventory control, or low-rent store location are not possible on such fair-traded items. A cushioned margin of profit may help inefficient distributors in the field and stifle the initiative of ones who would seek to increase their volume by price reductions based on economies.[15] But the legislature has weighed these possible disadvantages against the balance of evils attending price-juggling on branded merchandise—the loss to the manufacturer of his good will, destruction of the independent retailer's competitive position and the consequent dilution of standards of quality for the consumer. And in the light of such legislative appraisal and approbation, the *per se* judicial condemnation of direct price fixing is hardly applicable simply because the producer is also a wholesaler.

Merely to establish a fair trade agreement with an independent wholesaler by a dual producer-wholesaler is insufficient to make out a *prima facie* case of restraint of trade under the Sherman Act. Are all such agreements privileged or only some of them? If the latter, what then is the line of demarcation between valid and illegal ones? We think the test consists of a factual showing of illegality. And this is not met simply by pointing to *some* restraint of competition. As Mr. Justice Brandeis observed: "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes com-

13. See Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683; National Association of Window Glass Mfgrs. v. United States, 263 U.S. 403, 44 S.Ct. 148, 68 L.Ed. 358; Standard Oil Co. (Indiana) v. United States, 283 U.S. 163, 179, 51 S.Ct. 421, 75 L.Ed. 926; Appalachian Coals, Inc. v. United States, 288 U.S. 344, 377, 53 S.Ct. 471, 77 L.Ed. 825.

14. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700; United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; United States v. Joint Traffic Ass'n, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259; Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107; F. T. C. v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534. See also Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 408–409, 31 S.Ct. 376, 55 L.Ed. 502.

15. Hearings before a Subcommittee of the Committee on Interstate and Foreign Commerce on H.R. 5767, 82d Cong., 2d Sess. 314, 318, 323 (1952).

petition or whether it is such as may suppress or even destroy competition." [16]

■ Since every fair trade agreement made by a producer who acts in no other capacity necessarily restrains competition, the "true test of legality" in the situation of the producer-wholesaler of dual capacity is whether some *additional* restraint destructive of competition is occasioned. A showing of actual or potential competition in such situation between the producer-controlled wholesaler and the independent one would be material but not determinative of such additional restraint destructive of competition. On the other hand, such agreements might violate the Sherman Act, without any showing of competition. If, for example, it could be established that a producer became a wholesaler, though not in competition with an independent wholesaler, and stipulated prices for his own and the independent wholesaler as a first step toward and with intent to gouge consumers, that might suffice *prima facie* as violation of the Sherman Act outside the privilege of the fair trade statutes. The weight then to be given to an item of proof, such as competition between the controlled and independent wholesaler, will necessarily depend upon circumstances. In a continuum of probability, it may range from zero to evidence of preponderant probative force, depending upon the business setting. No inflexible standard should be laid down to govern in advance.

In the instant case, plaintiff has neither alleged nor made any factual showing of such additional restraint. Plaintiff suggests an evil similar to that condemned in United States v. Masonite Corp.[17] That case did not involve fair trade agreements, but rather a familiar attempt by a patentee, through agency and licensing arrangements, to extend a patent monopoly beyond limits of the patent and anti-trust statutes. Even considered as fair trade agreements a sufficient factual showing of illegality existed because several competing manufacturers, unrelated as buyers and sellers, agreed upon prices at which the product of one such manufacturer should be sold in competition with that of the others. Plaintiff claims that "the very existence of the price-fix on McKesson products may induce a competing wholesaler to buy McKesson products from the defendant rather than purchase other products that compete with McKesson products from some other manufacturer with whom the wholesaler is not in competition." Absent some factual showing that such is the case, we are unable to accept the proposition upon the force of its circumstantial probability, or at least to hold that its bare assertion amounts *prima facie* to a factual showing of illegality.

Upon the present state of the record then, plaintiff's motion for summary judgment must be denied without prejudice, of course, to its renewal upon a showing of additional uncontested facts in accordance with this opinion, or, if such facts are disputed, a showing of such additional facts on trial.

■ On two additional grounds, independent of those discussed above relating to defendant's dual capacity as manufacturer and wholesaler, plaintiff seeks summary judgment. One is that defendant's fair trade contracts contain an illegal boycott provision by requiring the reselling buyer to agree that not only the purchaser but also "any subsequent purchaser will not, in turn, resell them at less than the prescribed net retail minimum prices published by Seller." [18] Defendant denies present use of this clause, and an issue of fact is presented. The second ground concerns illegality of defendant's contracts with certain whole-

---

16. Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244.

17. 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461.

18. Cf. Masters Inc. v. Sunbeam Corp., D.C.S.D.N.Y., 112 F.Supp. 268 with Sunbeam Corp. v. Payless Drug Stores, D.C. N.D.Cal., 113 F.Supp. 31 and Act of July 14, 1952, 66 Stat. 631–2, 15 U.S. C.A. § 45(2).

salers located in Michigan, Georgia and Florida because allegedly in violation of the laws of those states. Defendant denies fair trade in these areas in violation of the State statute and accordingly a second issue of fact is presented. On these grounds then, plaintiff's motion for summary judgment is denied because of the existence of a triable issue of material fact.

Plaintiff's motion for summary judgment is accordingly denied.