UNITED STATES *v.* McKESSON & ROBBINS, INC.

No. 448.   Argued April 30, 1956.—Decided June 11, 1956.

*Ralph S. Spritzer* argued the cause for the United States. With him on the brief were *Solicitor General Sobeloff* and *Assistant Attorney General Barnes.*

*John P. McGrath* argued the cause for appellee. With him on the brief were *Laurence C. Ehrhardt* and *Marland Gale.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This is a direct appeal by the Government under the Expediting Act, 32 Stat. 823, 15 U. S. C. § 29, as amended by 62 Stat. 869, from a decision of the District Court for the Southern District of New York, interpreting the scope of the exemption from the antitrust laws provided by "fair trade" legislation.

Appellee, a Maryland corporation with its home office in New York, is the largest drug wholesaler in the United States. Operating through 74 wholesale divisions located in 35 States, it sells drugstore merchandise of various brands to retailers, principally drugstores, substantially throughout the nation. For the fiscal year ended March 31, 1954, its sales of all drug products amounted to $338,000,000.

Appellee is also a manufacturer of its own line of drug products, the total sales of which amounted to $11,000,-000 for the year ended March 31, 1954. Its manufacturing operation is conducted through a single manufacturing division, McKesson Laboratories, located at Bridgeport, Connecticut. This division, like each of appellee's wholesale divisions, has a separate headquarters and a separate staff of employees, but none of the 75 divisions is

separately incorporated. All are component parts of the same corporation and are responsible to the corporation's president and board of directors.

Appellee distributes its own brand products to retailers through two channels: (1) directly to retailers, and (2) through independent wholesalers. The major portion of its brand products is distributed to retailers through its own wholesale divisions. Appellee also makes direct sales to important retailers through its manufacturing division. Most of appellee's sales to independent wholesalers are made by its manufacturing division, but its wholesale divisions sold approximately $200,000 of McKesson brand products to other wholesalers during the fiscal year ended June 30, 1952.

To the extent possible under state law, appellee requires all retailers of its brand products to sell them at "fair trade" retail prices fixed by appellee. These prices are set forth in published schedules of wholesale and retail prices.

Appellee also has "fair trade" agreements with 21 independent wholesalers who buy from its manufacturing division. Sixteen of these independents compete with appellee's wholesale divisions. The other 5 compete with the manufacturing division for sales to chain drugstores located in their trading areas. On June 6, 1951, in accordance with appellee's "fair trade" policy, a vice president in charge of merchandising notified appellee's wholesale divisions that—

> "None of our wholesale divisions will sell any McKesson labeled products to any wholesaler who has not entered into a fair trade contract with McKesson Laboratories."

As a result, 73 of the independent wholesalers who had been dealing with McKesson wholesale divisions entered

into "fair trade" agreements with McKesson by which they bound themselves in reselling its brand products to adhere to the wholesale prices fixed by it. Each of these independent wholesalers is in direct competition with the McKesson wholesale division from which it buys.

The Government, under Section 4 of the Sherman Act,[1] brought this civil action for injunctive relief against appellee in the District Court. The complaint charged that appellee's "fair trade" agreements with independent wholesalers with whom it was in competition constituted illegal price fixing in violation of Section 1 of the Act. Appellee admitted the contracts, but claimed that they were exempted from the Sherman Act by the Miller-Tydings Act[2] and the McGuire Act.[3]

The Government moved for summary judgment on the ground that these Acts do not immunize McKesson's agreements with other wholesalers, since they expressly exclude from their exemption from the antitrust laws contracts "between wholesalers" or "between persons, firms, or corporations in competition with each other." The district judge denied the motion.[4] He recognized that price fixing is illegal *per se* under the Sherman Act, but announced that in "fair trade" cases "No inflexible standard should be laid down to govern in advance." He was "unwilling, at this stage of case law development of legislatively sanctioned resale price fixing" to apply the *per se* rule "in fair trade situations absent a factual showing of illegality." Such a showing, he said, could not be made "simply by pointing to *some* restraint of competition." The "true test of legality" of "fair trade" agreements between a producer-wholesaler and independent

---

[1] 26 Stat. 209.

[2] 50 Stat. 693.

[3] 66 Stat. 632.

[4] 122 F. Supp. 333.

wholesalers, the court held, "is whether some additional restraint destructive of competition is occasioned." [5]

The case then proceeded to trial before another district judge, who concurred in the "ruling that fair trade price fixing by a producer-wholesaler was not per se illegal under the Sherman Act," and held that the Government's evidence did not establish an "additional restraint" within the meaning of the test previously enunciated in the case.[6] He ordered the complaint dismissed, and the Government took a direct appeal under the Expediting Act. We noted probable jurisdiction.[7]

The issue presented is a narrow one of statutory interpretation. The Government does not question the so-called vertical "fair trade" agreements between McKesson and retailers of McKesson brand products. It challenges only appellee's price-fixing agreements with independent wholesalers with whom it is in competition.

Section 1 of the Sherman Act provides:

> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. . . ." [8]

It has been held too often to require elaboration now that price fixing is contrary to the policy of competition underlying the Sherman Act and that its illegality does

---

[5] 122 F. Supp., at 337–339. The district judge provided an illustration of the kind of conduct which might satisfy his test:
"If, for example, it could be established that a producer became a wholesaler, though not in competition with an independent wholesaler, and stipulated prices for his own and the independent wholesaler as a first step toward and with intent to gouge consumers, that might suffice *prima facie* as violation of the Sherman Act outside the privilege of the fair trade statutes."

[6] R. 180.

[7] 350 U. S. 922.

[8] 26 Stat. 209.

not depend on a showing of its unreasonableness, since it is conclusively presumed to be unreasonable.[9]  It makes no difference whether the motives of the participants are good or evil; whether the price fixing is accomplished by express contract or by some more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or to decrease prices.[10]

In *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, in holding price-fixing agreements to be illegal *per se*, this Court said:

> "Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. . . . the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." [11]

And it has been said by this Court:

> "A distributor of a trade-marked article may not lawfully limit by agreement, express or implied, the price at which or the persons to whom its purchaser may resell, except as the seller moves along the route which is marked by the Miller-Tydings Act." [12]

The question before us is whether the price-fixing agreements challenged herein move along that route.  If they do not, they are illegal *per se*.  There is no basis for supposing that Congress, in enacting the Miller-Tydings and McGuire Acts, intended any change in the traditional

---

[9] *E. g., United States* v. *Trenton Potteries Co.*, 273 U. S. 392, 397; *Ethyl Gasoline Corp.* v. *United States*, 309 U. S. 436, 458.  See also *Standard Oil Co.* v. *United States*, 221 U. S. 1, 65.

[10] *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 221–224.

[11] 310 U. S., at 221–222.

[12] *United States* v. *Bausch & Lomb Co.*, 321 U. S. 707, 721.

*per se* doctrine. The District Court was plainly in error in attempting to create a category of agreements which are outside the exemption of those Acts but which should nevertheless be spared from application of the *per se* rule.

In the Miller-Tydings Act, passed as a rider to a District of Columbia revenue bill, Congress was careful to state that its exemption of certain resale price maintenance contracts from the prohibitions of the antitrust laws "shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or *between wholesalers,* or between brokers, or between factors, or between retailers, or *between persons, firms, or corporations in competition with each other.*"[13] (Emphasis supplied.)

Fifteen years later, Congress attached an almost identical proviso to the McGuire Act.[14] We are to take the

---

[13] 50 Stat. 693. This proviso qualified the proviso immediately preceding it, which amended § 1 of the Sherman Act so as to make lawful resale price maintenance contracts entered into by manufacturers of branded or trade-marked goods if such contracts are authorized by state law as to intrastate transactions and if the commodity affected is in "free and open competition with commodities of the same general class produced or distributed by others . . . ."

[14] 66 Stat. 632. The McGuire Act amended § 5 (a) of the Federal Trade Commission Act by adding, *inter alia,* § 5 (a)(2). This specifically exempts from the antitrust laws price fixing under "fair trade" agreements which bind not only retailers who are parties to the agreement but also retailers who refuse to sign the agreement. As in the Miller-Tydings Act, the statutory exemption was qualified by an important proviso. This stated:

"(5) Nothing contained in paragraph (2) of this subsection shall make lawful contracts or agreements providing for the establishment or maintenance of minimum or stipulated resale prices on any commodity referred to in paragraph (2) of this subsection, between manufacturers, or between producers, or *between wholesalers,* or

words of these statutes "in their normal and customary meaning." *Schwegmann Bros.* v. *Calvert Corp.,* 341 U. S. 384, 388.

Appellee is admittedly a wholesaler with resale price maintenance contracts with 94 other wholesalers who are in competition with it. Thus, even if we read the proviso so that the words "in competition with each other" modify "between wholesalers," the agreements in question would seem clearly to be outside the statutory exemption. Appellee concedes that the proviso does not exempt a contract between two competing independent wholesalers fixing the price of a brand product produced by neither of them.[15] Yet it urges that what would be illegal if done between competing independent wholesalers becomes legal if done between an independent wholesaler and a competing wholesaler who is also the manufacturer of the brand product. This is so, appellee maintains, because in contracting with independent wholesalers it acted solely as a manufacturer selling to buyers rather than as a competitor of these buyers. But the statutes provide no basis for sanctioning the fiction of McKesson, the country's largest drug wholesaler, acting only as a manufacturer when it concludes "fair trade" agreements with competing wholesalers. These were agreements "between wholesalers."

Any doubts which might otherwise be raised as to the propriety of considering a manufacturer-wholesaler as a

---

between brokers, or between factors, or between retailers, or *between persons, firms, or corporations in competition with each other."* (Emphasis supplied.)

[15] Appellee's brief, p. 6. In the District Court and in its motion to affirm filed in this Court, however, appellee claimed that the proviso applies only to agreements "between manufacturers of competing products, or between wholesalers of competing products, or retailers of such products, fixing the prices at which *two or more* competitive products are to be sold." (Appellee's emphasis.) Motion to affirm, pp. 5–6.

"wholesaler" are dispelled by the last phrase of the proviso in question, which continues the proscription against price-fixing agreements "between persons, firms, or corporations in competition with each other." Congress thus made as plain as words can make it that, without regard to categories or labels, the crucial inquiry is whether the contracting parties compete with each other. If they do, the Miller-Tydings and McGuire Acts do not permit them to fix resale prices. The Court stated in *Schwegmann Bros.* v. *Calvert Corp.*, 341 U. S. 384, 389, that this proviso "expressly continues the prohibitions of the Sherman Act against 'horizontal' price fixing by those in competition with each other at the same functional level." [16] Since appellee competes "at the same functional level" with each of the 94 wholesalers with whom it has price-fixing agreements, the proviso prevents these agreements from falling within the statutory exemption.

Appellee argues that a brief colloquy on the Senate floor between a supporter of the McGuire Act and an inquiring Senator shortly before the Act was passed should dictate a meaning contrary to that revealed by the Act's plain language. But, at best, the statement was inconclusive. [17] And the Senator whose statement is relied on was not in charge of the bill, nor was he a member of

---

[16] Previous phrases of the proviso appear in state "fair trade" laws, upon which the proviso seems to have been modeled. FTC Report on "Resale Price Maintenance," pp. 80–81 (1945). The last phrase, however, has apparently never been included in any state statute. Thus, meticulous inclusion of this phrase in the federal acts is not without significance.

[17] 98 Cong. Rec. 8870. Senator Humphrey, in answer to an inquiry by Senator Sparkman, said:

". . . If, for example, when a producer, who sells to distributors, wholesalers, retailers, and consumers, makes a resale price-maintenance agreement relative to a commodity made by him and bearing a trade-mark or brand, with a distributor, wholesaler, or retailer who resells such commodity at either the wholesale, or retail level, there

any committee that had considered it. Moreover, the McGuire Act was not a Senate bill, having been passed by the House of Representatives prior to this Senate discussion. There is nothing in the proceedings of the

exists a vertical resale price-maintenance contract which would be lawful under the bill if the requirements of paragraph (2) are met.

"On the other hand, *if one wholesaler enters into a resale price-maintenance agreement with another wholesaler prescribing the price at which they both sell a trade-marked or branded commodity which they both buy from the producer, that agreement would be horizontal and would not be made lawful.*

"In other words, wholesalers getting together on a price are acting illegally. For a manufacturer to get together with other manufacturers to maintain prices is illegal, but for a manufacturer to say that a certain product will sell at a certain price from the manufacturer down to the retailer is legal under the limitations prescribed in paragraph (2) of section 5 (a) of the Federal Trade Commission Act.

"In general, the test of whether a resale price-maintenance contract is vertical is if the contract is between a seller and buyers who resell the original seller's product; whereas, the test of whether a resale price-maintenance contract is horizontal as if it is between competing sellers between whom the relation of buyer and seller or reseller does not exist as to the product involved.

"It is important to keep this distinction in mind, because *many producers of trade-marked items sell them to consumers, retailers, and wholesalers alike.*

"*Under the bill, such firms may make resale price-maintenance contracts with both wholesalers and retailers because such contracts are vertical, that is, between sellers and buyers.* While in one sense firms in this position function not only as producers but also as wholesalers and retailers, they may still lawfully make contracts with other wholesalers and retailers, when in making such contracts they act as producers of a trade-marked or branded commodity, rather than as wholesalers and retailers entering into forbidden horizontal resale price-maintenance contracts with other wholesalers or other retailers." (Emphasis added.)

It should be noted that these remarks appear to be confined to the "between wholesalers" and "between retailers" phrases and do not deal with the "corporations in competition" phrase. And, even as to the former, it is not at all clear that Senator Humphrey was discussing the situation where actual competition exists between the manufac-

House to indicate that the meaning for which appellee contends should be given to the Act. Similarly, except to show congressional concern that the prohibition against "horizontal" price fixing be continued, the Senate and House debates on the proviso in the Miller-Tydings Act are of little assistance with respect to the problem before us.

The court below did not rely on the legislative history, finding it to be "unedifying and unilluminating." [18] We agree with this appraisal, but are not troubled by it since the language of the proviso in question is unambiguous.[19] It excludes from the exemption from the *per se* rule of illegality resale price maintenance contracts between firms competing on the same functional level.

Both the Government and appellee press upon us economic arguments which could reasonably have caused Congress to support their respective positions.[20] We need

---

turer-wholesaler and independent wholesalers. As indicated in note 15, *supra*, until we noted probable jurisdiction, appellee flatly disagreed with an important part of this statement.

[18] 122 F. Supp., at 336.

[19] Cf. *Greenwood* v. *United States*, 350 U. S. 366, 374.

[20] The Government maintains that a resale price maintenance agreement between a manufacturer-wholesaler and competing independent wholesalers, in addition to eliminating competition between the parties, enables the former, because of its leverage as a manufacturer of branded products, to dictate the latter's prices on these products. Such an agreement, the Government claims, also leaves the manufacturer-wholesaler free to undersell the independent wholesalers when dealing with large retailers directly through its manufacturing division. And if the manufacturer's own wholesale outlets are inefficient, resale price maintenance permits it to insulate those outlets from the inroads of more efficient operators by setting its "fair trade" price higher than otherwise. According to the Government, none of these effects is present where price fixing exists between independent wholesalers and a nonintegrated manufacturer.

Appellee contends that the economic effects of "fair trading" are the same whether or not the manufacturer has its own wholesale out-

not concern ourselves with such speculation. Congress has marked the limitations beyond which price fixing cannot go. We are not only bound by those limitations but we are bound to construe them strictly, since resale price maintenance is a privilege restrictive of a free economy. Cf. *United States* v. *Masonite Corp.,* 316 U. S. 265, 280.

The judgment of the District Court dismissing the complaint must, therefore, be reversed and the case remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER and MR. JUSTICE BURTON join, dissenting.

Lack of sympathy with an Act of Congress does not justify giving to it a construction that cannot be rationalized in terms of any policy reasonably attributable to Congress. Rather our duty, as always, is to seek out the policy underlying the Act and, if possible, give effect

lets, since the protection which resale price maintenance provides to the manufacturer's good will "necessarily involves elimination of price competition among different outlets for the manufacturer's own branded merchandise." In both situations, appellee claims, the manufacturer makes "at the source, as a manufacturer, . . . downstream price fixing arrangements with its outlets."

The court below indicated an awareness of the economic arguments on both sides but refused to follow "either of alternate horns . . . in the dilemma of fair trade agreements with independent wholesalers by a manufacturer who is also a wholesaler . . . ." 122 F. Supp., at 337. Instead, the district judge advocated a case-by-case examination of the economic setting in which the question arises, with the burden on the Government to show "some *additional* restraint destructive of competition." 122 F. Supp., at 339.

For discussion of these economic contentions and the conclusions which they are designed to support, see Weston, Resale Price Maintenance and Market Integration: Fair Trade or Foul Play? 22 Geo. Wash. L. Rev. 658; Note, 64 Yale L. J. 426; 54 Col. L. Rev. 282.

to it. In this instance, I think the Court has departed from that rule by giving the Miller-Tydings and McGuire Acts an artificial construction which produces results that could hardly have been intended by Congress.

The purpose of the state fair-trade laws is to allow the manufacturer of a brand-named product to protect the goodwill his name enjoys by controlling the prices at which his branded products are resold. *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp.*, 299 U. S. 183, 193–194. The necessary result—indeed, the very object—is to permit the elimination of price competition in the branded product among those who sell it. Congress has sanctioned those laws in the Miller-Tydings and McGuire Acts, considering them not to be offensive to federal antitrust policy.[1] Sufficient protection to the public interest was deemed to be afforded by the competition among different brands, a safeguard made express by the provision of the Miller-Tydings and McGuire Acts denying fair-trade contracts exemption from the antitrust laws unless the fair-traded product is "in free and open competition with commodities of the same general class." In short, the very purpose of the Acts is to permit a manufacturer to set the resale price for his own products while preserving competition between brands—that is, between the fair-traded item and similar items produced by other manufacturers.

If we accept the legislative judgment implicit in the Acts that resale price maintenance is necessary and desirable to protect the goodwill attached to a brand name,

[1] The Court refers to the Miller-Tydings Act as having been "passed as a rider to a District of Columbia revenue bill." It is pertinent to note that, in passing the later McGuire Act, Congress not only reaffirmed the policy of the Miller-Tydings Act but also eliminated the restrictive effect of this Court's decision in *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384, as regards "non-signers" of fair-trade contracts.

there is no meaningful distinction between the fair-trade contracts of integrated and non-integrated manufacturers. Certainly the integrated manufacturer has as strong a claim to protection of his goodwill as a non-integrated manufacturer, and the economic effect of the contracts is the same. In both cases price competition in the resale of the branded product is eliminated, and in neither case does the price fixing extend beyond the manufacturer's own product. While the Government concedes the right of a non-integrated manufacturer to eliminate price competition in his products between wholesalers, it finds a vice not contemplated by the Acts when one of the "wholesalers" is also the manufacturer, for then the contracts eliminate competition between the very parties to the contracts. But, in either case, all price competition is eliminated, and I am unable to see what difference it makes between whom the eliminated competition would have existed had it not been eliminated. The other bases of distinction suggested by the Government are equally tenuous and reflect a subtlety of analysis for which there is no support in either the Acts or their history.

So unsatisfactory, indeed, are the Government's attempts to rationalize the result contended for, that the Court chooses not to rely upon them, finding the language of the provisos so clear as to make it unnecessary even to hypothesize a consistent rationale attributable to Congress that might justify the discrimination against integrated producers. Indeed, not even the fact that the only legislative history directly in point is squarely opposed to the Court's reading of the statute (see note 17 of the Court's opinion, pp. 313–315) prompts enough doubt in the Court to require an inquiry into the purpose of the Acts. The Court's reasoning is this: the provisos except from the Acts contracts "between wholesalers" or "between persons, firms, or corporations in competition with each other"; McKesson is a "wholesaler"

as well as a manufacturer and is also "in competition with" independent wholesalers; its contracts with independent wholesalers are therefore forbidden contracts "between wholesalers" and between "corporations in competition with each other." This verbalistic argument can be answered by the equally verbalistic one that the fair-trade contracts, being made in connection with the sale of its own branded products, were made by McKesson in its capacity as a "manufacturer" rather than as a competing "wholesaler." Neither argument being more conclusive than the other, the answer to the problem can be found only by looking to the purpose of the provisos and its relation to the basic policy of permitting resale price maintenance of branded goods.

As noted above, the Acts necessarily contemplate the elimination of price competition in the resale of a particular branded product and rely for protection of the public interest upon competition between brands. Viewed in the light of this purpose, the provisos become readily understandable. The vice of price-fixing agreements between those in competition with each other, whether at the manufacturing, wholesaling, or retailing level, is that they can be utilized to eliminate competition *between brands*. Thus manufacturers might agree to fix the resale prices of their competing brands in relation to each other; the same result, on an even broader scale, could be achieved by agreements between wholesalers or retailers. Further, agreements initiated by anyone other than the owner of the brand name are unnecessary to the protection of goodwill, the very justification for permitting fair-trade contracts. Thus an agreement between wholesalers to fix the price of a product bearing the trade name of neither would serve no purpose other than the elimination of competition. Interpreting the provisos in the light of these considerations, I conclude that an integrated manufacturer selling

its products under fair-trade contracts to independent wholesalers should be deemed to be acting as a "manufacturer" rather than as a "wholesaler." This interpretation of the provisos fits with their terms and produces, rather than an arbitrary discrimination hardly intended by Congress, a result fully in harmony with the policy of the Acts to permit manufacturers to maintain the resale prices of their branded products while preserving competition between brands.[2]

For these reasons, therefore, I would hold McKesson's contracts to be within the Miller-Tydings and McGuire Acts and would affirm the judgment below.

---

[2] The Federal Trade Commission, the administrative agency specially charged with administering the McGuire Act, has reached like conclusions. See *Eastman Kodak Co.*, 3 CCH Trade Reg. Rep. (10th ed.), par. 25, 291.