**The UPJOHN COMPANY, Plaintiff,**

v.

**CHARLES LABS, INC., Defendant.**

**No. 65 Civ. 1288.**

United States District Court
S. D. New York.
Dec. 14, 1967.

Rogers, Hoge & Hills, New York City, for plaintiff, George Chapman, Richard Saudek, New York City, of counsel.

W. Edward Woods, New York City, for defendant.

## OPINION

TENNEY, District Judge.

Plaintiff, a drug manufacturer, has instituted suit under the Feld-Crawford Act (New York General Business Law, McKinney's Consol.Laws, c. 20, §§ 369–

a, 369–b) to enjoin defendant, a retail druggist, from selling plaintiff's trademarked products at prices less than those stipulated in plaintiff's fair trade contracts.

Plaintiff seeks only an injunction.

I find the facts to be as follows:

1. Plaintiff is a corporation organized and existing under the laws of the State of Delaware, licensed to do business within the State of New York, and maintains an office within this district.

2. Defendant is a corporation organized and existing under the laws of the State of New York, having its principal place of business within this district, specifically at 62 East 14th Street, City, County and State of New York.

3. Plaintiff is engaged in the manufacture, production, sale and distribution of pharmaceutical drugs, medicines and other commodities.

4. Plaintiff is considered a full-line drug house in that 20 per cent of its line are now prescription or over-the-counter items, the remainder being distributed evenly between antibiotics, steroids or hormones, and anti-diabetic drugs.

5. Each product manufactured and sold by plaintiff bears the trademark "Upjohn" and product marks such as "Unicap", "Zymacap", "Cheracol" and "Kaopectate", all of which are affixed to the packages and cartons in which such products are packaged.

6. Plaintiff's products bearing its trademarks are in free and open competition with like products of other pharmaceutical manufacturers, such as Parke, Davis & Co., Mead Johnson & Co., and E. R. Squibb, Division of Olin Mathieson Chemical Co.

7. During the past several years, plaintiff has expended on the average of $3,000,000.00 per year (6–7 per cent of which has been exclusively allocated to the New York area) for its extensive and continuous program of advertising in medical and other professional jour-nals, in lay magazines and, more recently, on television.

8. Plaintiff's products enjoy a good reputation in the trade, and it has built up valuable good will with doctors, dentists, pharmacists, hospital and industrial accounts, as well as with consumers.

9. Annual sales of the plaintiff for the entire country approximated $200,-000,000.00 in each of the past several years.

10. Plaintiff sells its products to wholesale druggists, retail druggists, hospitals, veterinary hospitals, physicians and industrial clinics.

11. Defendant operates a drugstore at 62 East 14th Street, New York City, in which it sells at retail products purchased directly from plaintiff and those of other drug and pharmaceutical manufacturers.

12. Plaintiff has entered into uniform fair trade contracts with retailers in the State of New York under which it has established minimum prices for the retail sale of products bearing its name and trademarks, which products may be sold over the counter without the prescription of a physician, dentist or veterinarian.

13. Plaintiff, however, has not entered into such a contract with defendant.

14. When a violation of the plaintiff's fair trade price schedule is reported, voluntary compliance is first sought by sending a salesman to call upon the account to inform it of plaintiff's fair trade policy, and to request that said account maintain the fair trade prices on the Upjohn products. The salesman returns to the retailer after a reasonable length of time to inquire whether fair trade prices are being maintained. If the retailer persists in price-cutting, the matter is referred to counsel for appropriate action. Plaintiff's counsel is invested with full authority to issue warning letters to the retailers and to shop at the store and bring suit against any

retailer found to be cutting prices on plaintiff's products.

15. Plaintiff has, when necessary, brought enforcement actions to eliminate price violations by retailers in the State of New York and has uniformly and diligently enforced its retail fair trade program, as evidenced by the number of suits which have been brought on behalf of plaintiff and the 200 or more injunctions which have been obtained as a result thereof.

16. Having discovered that defendant was offering for sale and selling, at retail, products bearing plaintiff's name and trademarks at prices below those established by plaintiff in its fair trade agreements with other retail druggists in the State of New York, plaintiff notified defendant of the stipulated minimum retail prices for which plaintiff's over-the-counter products may be sold, and particularly warned defendant, in a letter dated February 18, 1963, not to price-cut these fair traded items.

17. Defendant failed to comply with plaintiff's request and has continued to offer for sale and to sell plaintiff's products at prices lower than those stipulated in plaintiff's fair trade schedule. On three separate occasions, after having been notified of plaintiff's fair trade schedule, defendant sold to professional shoppers a package of 100 Unicap Vitamins for approximately $2.16, whereas the minimum fair trade price therefor was $3.11.

18. Plaintiff, on an annual basis (including the years 1964, 1965, 1966 and 1967), had offered to its direct retail accounts a certain combination-deal package of 124 Unicap vitamin capsules, such combination consisting of a package of 100 and a package of 24, which combination, under plaintiff's minimum resale price, could be offered for sale and sold to the public at the price established for a package of 100 Unicap vitamins. This offer, however, was only available to the retailers during the three-month "deal period" of each of the aforementioned years.

19. Until 1967, there existed only a limited amount of "deal packages" which could be offered to the retailers, so, consequently, each retailer was allocated an amount of packages directly proportional to its total sales over the course of each year. In 1967, however, when the ceiling on deal-package production was lifted, each retailer could acquire as much of the deal merchandise as it desired, limited only by the maximum amount of credit that plaintiff would extend to each individual retail account.

20. This Court finds no convincing evidence to support defendant's contention that in order for a retail account to purchase an amount of deal packages plaintiff required a purchase of an equal amount or an additional amount of plaintiff's other distributed products.

### DISCUSSION

Plaintiff's over-the-counter products are fair-traded. On July 31, 1952, plaintiff entered into a fair trade contract with St. Moritz Chemists, Inc., a New York retailer. Upjohn has a number of similar contracts in effect with retailers in the New York area.

The contract, in pertinent part, reads as follows:

Whereas, the "Commodities", shown on Schedule A hereto attached, as such Schedule shall be constituted from time to time, are, or may hereafter be, distributed under the trademarks, brands or name of "Manufacturer" in fair, free and open competition with commodities of the same general class produced by others, and the parties hereto desire to avail themselves of the benefits of the Fair Trade Act of the above mentioned State,

Now, Therefore, in consideration of the premises and the mutual obligations herein assumed, the parties hereto agree as follows:

(1) "Retailer" will not (except as specifically permitted by said Fair

Trade Act) directly or indirectly advertise, offer for sale, or sell any of such "Commodities" in said State at less than the minimum retail prices stipulated therefor by "Manufacturer".

(2) The minimum retail prices stipulated by "Manufacturer" for the "Commodities" in said State are those now or hereinafter designated in Schedule A plus, in each sale, the amount of all sales and excise taxes applicable to such retail sale in said State.

(3) "Manufacturer" at any time and from time to time, upon ten days' written noice to "Retailer", may eliminate "Commodities" from Schedule A, and/or may add to said Schedule, and stipulate minimum retail prices for, additional "Commodities", and may change the minimum retail price of any one or more of the "Commodities"

\* \* \* \* \* \*

(5) "Manufacturer" in good faith will employ all appropriate means, which in the circumstances shall be reasonable, including legal proceedings if such other means fail, to prevent, and to enforce the discontinuance of, any violation of said minimum retail price stipulations by any competitor of "Retailer", whether the person violating or threatening such violation is or is not a party to a fair trade contract with "Manufacturer" covering said "Commodities".

This contract stipulating minimum resale prices and the enforcement thereof is authorized under the provisions of the Feld-Crawford Act, N.Y. General Business Law §§ 369–a, 369–b, and is exempted from the Federal Antitrust laws by the Miller-Tydings Amendment, 15 U.S.C. § 1 and by the McGuire Act, 15 U.S.C. § 45(a) (1) (2) (3) (4).

Plaintiff, having received a complaint that defendant had been selling its products below the fair trade minimum prices, notified defendant, by letter dated February 18, 1963, of plaintiff's fair trade contracts and of the minimum retail prices for its products established thereby. In this letter, plaintiff demanded that defendant discontinue its practice of price-cutting with regard to said products.

Subsequently, professional shoppers employed on behalf of plaintiff made purchases of plaintiff's products from defendant at less than the fair trade minimum prices. On each of three occasions, a professional shopper purchased a package of 100 Unicap vitamins for approximately $2.16, whereas the minimum fair trade price therefor was $3.11.

Defendant candidly admits to the violations with which it is charged and further admits that in selling said products defendant was not closing out its stock, nor were such products damaged or deteriorated in quality, nor were such sales made by an officer acting under the order of any court, thereby placing each and every violative sale outside the penumbra of statutory exceptions.

Defendant contends, however, that in spite of its conceded violations, plaintiff is barred from enforcing its fair trade contracts on the grounds that plaintiff's implementation of its fair trade program was such that it violated the antitrust laws of the United States in ways not exempted by the Miller-Tydings Amendment to the Sherman Antitrust Act, 15 U.S.C. § 1, and the McGuire Act, 15 U.S.C. § 45.

Specifically, defendant contends that:

1. Plaintiff tied in sales of other Upjohn products with the sales of the combination package in violation of Title 15 U.S.C. § 1.

2. Plaintiff, by selling its products directly to hospitals and industrial accounts, acted in the capacity of a retailer, and thereby directly competed with defendant. Thus, it is contended that plaintiff manufacturer, by virtue of such competition with those distributors against whom it seeks to enforce its fair trade agreements, is in violation of the antitrust laws, and in such posture is barred from enforcing the aforementioned agreements. United States v. McKesson & Robbins, Inc., 351 U.S. 305, 309, 310, 76 S.Ct. 937, 100 L.Ed. 1209 (1956).

■ Considering defendant's first contention with respect to an alleged tying-in arrangement by plaintiff of its combination package with other items in its product line, this Court finds no credible evidence to support this evidently specious charge. The mere fact that defendant, in its intensive search through invoices which plaintiff sent to defendant and others, was able to find an occasional transaction in which defendant or another retailer purchased an amount of one product equivalent to its purchase of the combination package is insufficient evidence to corroborate defendant's testimony that plaintiff's salesmen imposed such an illegal condition— testimony which is sharply disputed and to which little, if any, credence may be given.

Defendant's second contention that plaintiff, by its direct sales to hospitals and industrial accounts, has become a direct competitor with the retail drug accounts and therefore cannot force the retailers to abide by plaintiff's fair trade agreements, is equally without merit.[1]

■ It is established that fair trade prices may not be enforced "between persons, firms or corporations in competition with each other", under the theory that a manufacturer or producer cannot sell to one and at the same time compete with him. Federal Trade Commission Act, § 5 as amended 15 U.S.C. § 45; United States v. McKesson & Robbins, Inc., supra, 351 U.S. at 312, 76 S.Ct. 937, 100 L.Ed. 1209; Esso Standard Oil Co.

v. Secatore's Inc., 246 F.2d 17, 21 (1st Cir.), cert. denied, 355 U.S. 834, 78 S. Ct. 54, 2 L.Ed.2d 46 (1957); Mead Johnson & Co. v. West Chester Discount Health & Vitamin Center, Inc., 212 F. Supp. 310, 314 (E.D.Penn.1962).

■ "Competition", the nature of which prohibits the enforcement of fair trade agreements, exists when two or more business enterprises solicit business from and direct their sales to the same general class of consumers. Esso Standard Oil Co. v. Secatore's, Inc., supra.

■ Hospitals are institutions which use their drug products as an incident to the service which they provide to in-patients whose illnesses require continual medical attention. Industrial accounts require drug products for use in their company clinics, which are maintained for the purpose of giving prompt medical aid to ailing employees. Neither of these accounts can be considered retail customers or retail drug stores in disguise. They render on-the-spot service and in no way provide the patients or employees with their everyday drug requirements. Inasmuch as retail sales consist of "all marketing transactions in which the purchaser is actuated solely by a desire to satisfy his own personal wants or those of his family or friends through the personal use of the commodity * * * purchased", Roland Elec. Co. v. Walling, 326 U.S. 657, 674, 66 S.Ct. 413, 421, 90 L.Ed. 383 (1945); Parke, Davis & Co. v. Janel Sales Corp., 328 F.2d 105, 106 (2d

1. Pg. 12. Defendant relies on United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956), Ar-Ex Products Co. v. Capital Vitamin & Cosmetic Corp., 351 F.2d 938 (1st Cir. 1965), and Esso Standard Oil Co. v. Secatore's, Inc., 246 F.2d 17 (1st Cir.), cert. denied, 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed. 2d 46 (1957), in support of this proposition. Each of these cases is clearly distinguishable from the present suit in that each involves a plaintiff-manufacturer directly selling its products to individuals or businesses, who but for their dealings with plaintiff, would normally be the customers of those accounts with which plaintiff maintains its fair trade agreements. In the present action, no evidence is presented which tends to show that hospitals and industrial clinics are normally the customers of retail drug outlets. See Johnson & Johnson v. Janel Sales Corp., 192 F.Supp. 780, 786 (S.D.N.Y.1961). In fact, because of the volume purchases which hospitals and industrials are required to make, these accounts are more properly the accounts of wholesalers. This is reflected in the fact that both the hospitals and industrials were charged the same price for the drug products as were the retail drug outlets, thus eliminating the retailers' mark-up which these accounts would have to pay if they were to purchase their supplies over the retail counter.

Cir.), cert. denied, 379 U.S. 835, 85 S. Ct. 67, 13 L.Ed.2d 42 (1964), the aforementioned transactions do not fall within the retail category.

Thus, in essence, where a manufacturer sells its products to commercial or institutional establishments, which establishments buy not for their own personal use as ultimate consumers but, rather, as accessories to their overall operations, the manufacturer cannot be said to be in competition with the retail drug outlet, and, therefore, said sales cannot be made the basis for denying plaintiff's right to enforce its fair trade agreements. Parke, Davis & Co. v. Janel Sales Corp., supra; Johnson & Johnson v. Avenue Merchandise Corp., 193 F. Supp. 282, 289 (S.D.N.Y.1961). Furthermore, there has not been the slightest indication that those hospitals and industrial accounts were mere subterfuges for the sale of plaintiff's products to ultimate consumers at less than the fair trade price or, indeed, that any such sales in fact occurred. Parke, Davis & Co. v. Rocket Drugs, Inc., 214 F.Supp. 937, 939 (S.D.N.Y.1963); Upjohn Co. v. Liberty Drug Co., 193 F.Supp. 701, 703 (S.D.N.Y. 1959).

Finally, a question to be answered in this action is "if plaintiff refrains from selling its products directly to its hospital and industrial accounts, would said accounts look to the retail drug stores for their supplies?" As far as it has been shown, the answer is no. These accounts are properly the customers of wholesalers and, consequently, do not fit within that class of consumers which purchases its drug products over the retail counter. Mead Johnson & Co. v. West Chester Discount Health & Vitamin Center, Inc., supra 212 F.Supp. at 314. If defendant, however, was intending to show otherwise, it was defendant's burden to show that these institutions were customarily supplied by the retail drug outlets. Defendant has failed to offer evidence on this issue. Johnson & John-son v. Janel Sales Corp., 192 F.Supp. 780, 786 (S.D.N.Y.1961).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this litigation.

2. The products manufactured and sold by plaintiff are in fair and open competition with products of other pharmaceutical and drug manufacturers.

3. Plaintiff's fair trade contracts with retailers in New York are within the exemption of the Miller-Tydings Act and the McGuire Act and are not invalid under the Sherman Antitrust Act.

4. Defendant has wilfully and knowingly sold at retail products bearing plaintiff's name and trademarks for less than the retail fair trade prices, in violation of the legal rights of plaintiff and of the Feld-Crawford Act.

5. Plaintiff, by its practice of manufacturing and/or distributing the combination packages as consumer deals, has not waived or abandoned its rights to enforce the minimum resale retail prices established pursuant to the Feld-Crawford Act by virtue of any conduct contrary to the antitrust laws of the United States.

6. Immediate, substantial and irreparable harm to the good will of plaintiff and to the business of the retailers who handle plaintiff's products now exists and is likely to continue by reason of the acts of defendant.

7. An injunction shall issue enjoining defendant, its agents, attorneys, employees, servants, representatives and any and all persons acting by or under their authority from advertising, offering for sale or selling at retail merchandise bearing plaintiff's name or trademarks for prices less than those stipulated in plaintiff's fair trade contracts and current supplements thereto in effect with retailers in the State of New York.