UNITED STATES, Appellee,

v.

Martin CAPUTO, Ship's Storekeeper
Third Class, U.S. Naval Ready
Reserve, Appellant.

USCMA Misc. No. 84–23.
CMR Misc. No. 83–08.

U.S. Court of Military Appeals.

July 23, 1984.

For Appellant: *Marshall G. Kaplan*, Esquire (argued); *Commander David C. Larson*, JAGC, USN (on brief); *Lieutenant Mark A. Zuboff*, JAGC, USNR.

For Appellee: *Lieutenant Commander R. Clayton Seaman, Jr.*, JAGC, USN (argued); *Commander W. J. Hughes*, JAGC, USN (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

■ This writ appeal presents an interesting question of jurisdiction over a naval reservist (Caputo) charged while on inactive duty for training with a drug offense and an unauthorized absence, both of which allegedly occurred during a two-week tour of active duty for training (ACDUTRA). On the grounds that personal and subject-matter jurisdiction were lacking, he moved to dismiss the charges—which had been referred to a special court-martial by the Deputy [1] Commander, Naval Reserve Readiness Command, Region Two. After the military judge denied the motion, Caputo petitioned unsuccessfully for extraordinary relief to the United States Navy-Marine Corps of Military Review.[2] 17 M.J. 921 (1984). In turn, he has taken a writ appeal to this Court in order to contest the jurisdiction of the court-martial.

I

On June 13, 1982, Caputo, who had prior military service, enlisted for 2 years in pay grade E-4 in the United States Naval Ready Reserve. At this time he requested assignment to and was assigned to Naval Reserve Cargo Handling Battalion Six, Detachment B, Naval Reserve Center, Fort Wadsworth, Staten Island, New York. In this connection, he executed a document—a copy of which is appended to this opinion. (Appendix A.) At the bottom of this document, above Caputo's signature, appears this language:

I accept the foregoing assignment fully understanding that while engaged in training pursuant thereto I shall be subject to the provisions of the Uniform Code of Military Justice.

1. A convening authority may only be *the* commanding officer, *see* Art. 23(a), Uniform Code of Military Justice, 10 U.S.C. § 823(a), and the power of a convening authority may not be delegated. *See United States v. Kalscheuer*, 11 M.J. 373, 376 (C.M.A.1981). However, we need not now determine whether the facts establish jurisdictional error in this proceeding.

2. Trial proceedings were suspended on the military judge's own motion to allow Caputo to petition appellate tribunals.

After June 13, 1982, Caputo regularly attended most of his scheduled training drills and received pay for his attendance. On February 7, 1983, pursuant to his obligation as a reservist to perform annually 14 days active duty for training, and in accordance with orders from the Chief of Naval Reserve, Caputo reported with other members from his unit to the Commanding Officer, Naval Supply Center, Pearl Harbor, Hawaii. Six days later, he was apprehended by a plainclothes member of the Honolulu Police Department for drinking in public in the vicinity of the Kuhio Beach Center, which is not on any military base or reservation. The arresting police officer conducted a "search incident to arrest" and discovered a "black film cannister [from which were] [p]rotruding ... three clear plastic bags containing purple pellets" in Caputo's coat. As a result of his arrest, Caputo was held in civilian custody from the evening of February 13 until sometime on February 15.

On and after February 13, authorities of Caputo's reserve drilling unit in Hawaii and authorities at his parent reserve unit in Staten Island were aware that he had been arrested for "drinking in public" and "promoting dangerous drugs" and had been held by civilian authorities. On February 18, 1983, Caputo returned to his parent reserve command, detached from ACDU-TRA, and went home. At some time between February 17 and March 2, 1983, higher authorities in Caputo's naval reserve chain-of-command became sufficiently aware of the details of his involvement with civilian authorities to consider possible prosecution for the alleged offenses.

On March 2 and 3, 1983, charges against Caputo, alleging possession of lysergic acid diethylamide (LSD) with intent to distribute and unauthorized absence, in violation of Articles 134 and 86, Uniform Code of Military Justice, 10 U.S.C. §§ 934 and 886, respectively, were prepared and sworn to at the Naval Reserve Center, Staten Island, New York. Seven days later, the Deputy Commander, Naval Reserve Readiness Command, Region Two, prepared a letter to the military magistrate at the Philadelphia Naval Base justifying planned pretrial confinement of Caputo. On March 12, 1983, Caputo reported for regularly scheduled inactive-duty-training with his unit of assignment—Naval Reserve Cargo Handling Battalion Six. Immediately thereafter, he was advised of the charges against him, given Article 31 and *"Tempia"* warnings,[3] and ordered into pretrial confinement.

On March 12, 1983, the Commanding Officer of the Cargo Handling Battalion, by letter, extended Caputo's inactive-duty-training status for an indefinite period of time and ordered him to report to the Commander, Naval Reserve Readiness Command, Region Two. Caputo was released from pretrial confinement on March 14, and on the same date civil authorities in Honolulu determined they would not prosecute him. Thereupon, the Naval Investigative Service obtained from the Honolulu Police Department previously withheld official reports of the arrest and the ensuing investigation of the incident involving Caputo.

On March 24, 1983, Caputo, through his detailed military defense counsel, protested the extension of his inactive-duty-training status. This protest was unavailing, and the convening authority took the position that, under the authority of Navy BUPERSMAN, Article 3420320 (6) (b), Caputo has properly been extended in an inactive-duty-training status, and thus is amenable to trial by court-martial.

On May 27, 1983, a special court-martial convened at the Philadelphia Naval Base to try Caputo on the charges that, while on active duty on February 13, 1983, he wrongfully possessed 200 microdot doses of LSD with the intent to distribute, and that he had been absent without authority from 8:00 a.m., February 14 until 10:00 p.m., February 15, 1983. Caputo was represented at trial by his military counsel and by his civilian counsel, Mr. Kaplan—who also argued the case before this Court.

---

3. *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

At the commencement of trial proceedings, a colloquy took place between Judge Haldeman, the military judge, and Mr. Kaplan, about the accused's failure to appear in uniform for the trial; civilian counsel took the position that Caputo lacked authority to wear a uniform because he was not on active duty while being tried.

After proceeding with arraignment, the judge considered the defense attack on the court-martial's jurisdiction. On June 1, 1983, he denied the motion to dismiss, concluding that both *in-personam* jurisdiction and subject-matter jurisdiction were present. However, in his Memorandum of Decision (p. 6), Judge Haldeman commented:

> Accordingly, the Military Judge finds the Special Court Martial convened in the instant case may only proceed to try the accused during the regularly scheduled inactive duty training periods of the accused. It is noted that failure of the accused to attend regularly scheduled inactive duty training periods may, under appropriate statutes, result in involuntary orders to active duty for at least 45 days.

After rendering his decision on the defense motion to dismiss, Judge Haldeman was replaced by Judge Edington,[4] who on June 23, 1983, heard reargument on the motion to dismiss. In a Memorandum of Decision dated July 25, 1983, Judge Edington decided that his predecessor erred in stating "that failure of ... [Caputo] to attend regularly scheduled inactive duty training periods ... [might] ... result in involuntary orders to active duty for at least 45 days." *Id.* at 1. Judge Edington also disagreed with Judge Haldeman's determination that the special court-martial could "only proceed to try the accused during the regularly scheduled inactive duty training periods of the accused." *Id.* at 2–4. Instead, he concluded that the Navy Military Personnel Manual, when read with paragraph 11*d* of the Manual for Courts-Martial, United States, 1969 (Revised edi-

tion), allowed jurisdiction of the court-martial, once perfected, "to continue" without interruptions until trial was completed. According to Judge Edington:

> The facts that the accused may not be physically performing military duties in a drill status at a reserve or active duty site and may be employed in a civilian occupation are not considered determinative. Under the facts and circumstances of this case, the accused remains a member of the Naval Reserve and cannot sever that relationship and thereby defeat jurisdiction.

*Id.* at 4.

## II

■ Caputo complains that the special court-martial lacked *in-personam* jurisdiction to try him. We may properly consider this challenge, for, as we have observed elsewhere:

> The Supreme Court has allowed by-passing ordinary procedures for review within the military justice system when accused persons have "raised substantial arguments denying the right of the military to try them at all." *Noyd v. Bond*, 395 U.S. 683, 696 n. 8, 89 S.Ct. 1876, 1884 n. 8, 23 L.Ed.2d 631 (1969).

*Murray v. Haldeman*, 16 M.J. 74, 76 (C.M.A.1983). A footnote to that opinion explained:

> Sometimes different rules are applied when the issue is whether a defendant may be tried at all. *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *Menna v. New York*, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975); *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *United States v. Schaffer*, 12 M.J. 425, 428 (C.M.A.1982).

*Id.* at 76 n. 2.

In line with these precedents, we granted extraordinary relief in *Cooke v. Orser*, 12 M.J. 335 (C.M.A. 1982), to a petitioner who claimed that his trial was barred by a

---

**4.** This was done by an oral modification, but written confirmation does not appear to be in the record. *See United States v. Perkinson*, 16 M.J. 400, 402 (C.M.A.1983).

promise of immunity. Likewise, in *Wickham v. Hall*, 12 M.J. 145 (C.M.A. 1981), a majority of the Court considered on its merits the petition for extraordinary relief of an accused who claimed that her receipt of an administrative discharge precluded trial by court-martial for alleged fraud in procuring the discharge.

In the present case, there is added reason to consider the petition on its merits. Apparently,[5] Caputo has already sought relief from a Federal District Court and from a Federal Court of Appeals, but—as we were informed by civilian counsel during oral argument—these courts declined to review the issue of the court-martial's jurisdiction on the ground that relief was available within the military-justice system. At this point, therefore, Caputo is entitled to receive an authoritative answer to the issue of whether he can be tried.

## III

If Caputo had been apprehended in Hawaii by military authorities while on his two-week tour of active duty, our task would be relatively simple. Article 2(a)(1) of the Uniform Code, 10 U.S.C. § 802(a)(1), provides that "persons lawfully called or ordered into, or to duty in or for training in, the armed forces" are subject to the Code "from the dates when they are required by the terms of the call or order to obey it." Thus, Caputo clearly was subject to military jurisdiction while he was performing his two-week tour of active duty for training.

Furthermore, we have recognized that jurisdiction continues once it has attached. Thus, in *United States v. Self*, 13 M.J. 132, 136 n. 7 (C.M.A.1982), where we considered jurisdiction to court-martial a national guardsman, we observed:

While retained on active duty a servicemember is subject to the Uniform Code. *See* Article 2, Uniform Code of Military Justice, 10 U.S.C. § 802. Paragraph 11*d* of the Manual for Courts-Martial, United States, 1969 (Revised edi-

tion), provides authority for retaining a servicemember on active duty so that he remains subject to military jurisdiction. *Moreover, it also seems to contemplate that court-martial jurisdiction, having once attached, continues even if an accused is released from active duty.* See *United States v. Schuering*, 16 U.S.C. M.A. 324, 330, 36 C.M.R. 480, 486 (1966); *United States v. Rubenstein*, 7 U.S.C. M.A. 523, 22 C.M.R. 313 (1957); *Perlstein v. United States*, 151 F.2d 167 (3d Cir. 1945), cert. dismissed as moot, 328 U.S. 822, 66 S.Ct. 1358, 90 L.Ed. 1602 (1946).

(Emphasis added.)

Although Judge Fletcher dissented in *Self*, his disagreement with the majority concerned only whether jurisdiction had attached before the accused reverted to civilian status. As he explained:

The Supreme Court and other federal courts, including this Court, have long interpreted congressional statutes concerning court-martial jurisdiction *in light of the principle of attachment of jurisdiction.* See *Lee v. Madigan*, 358 U.S. 228, 231, 79 S.Ct. 276, 278, 3 L.Ed.2d 260 (1959); *United States ex rel. Hirshberg v. Cooke*, 336 U.S. 210, 216–17, 69 S.Ct. 530, 533–534, 93 L.Ed. 621 (1949); *Carter v. McClaughry*, 183 U.S. 365, 383, 22 S.Ct. 181, 188, 46 L.Ed. 236 (1902); *Hironimus v. Durant*, 168 F.2d 288, 293 (4th Cir. 1948), cert. denied, 335 U.S. 818, 69 S.Ct. 40, 93 L.Ed. 373 (1948); *Barrett v. Hopkins*, 7 F. 312 (C.C.D. Kan. 1881); *United States v. Sippel*, 4 U.S.C.M.A. 50, 54, 15 C.M.R. 50, 54 (1954); *United States v. Mansbarger*, 20 C.M.R. 449, 453 (A.B.R.1955). In my opinion, this jurisdictional principle is equally applicable to the above portion of Article 2 which concerns a member of the state national guard on active duty for training in federal service.

13 M.J. at 139 (emphasis added; footnote omitted).

5. Most of our information about the collateral proceedings comes from statements by counsel, but for the most part the record does not reflect those proceedings.

264

In the case at bar, however, there is no contention by the Government that military jurisdiction attached while Caputo was in Hawaii. Although he was confined, this action was taken by local authorities with a view to civilian prosecution. It had nothing to do with his military duties or status or with any intended exercise of military jurisdiction; and, according to the findings of Judge Haldeman, the information necessary for military prosecution was unavailable until after Caputo had returned home from his two-week tour of active duty.

The Government now relies on Article 2(a)(3) of the Uniform Code, which authorizes military jurisdiction over "[m]embers of a reserve component while they are on inactive duty training authorized by written orders which are voluntarily accepted by them and which specify that they are subject to" the Code. Obviously, Congress intended that military jurisdiction exist over some reservists performing inactive duty training, but Caputo questions whether the language of Article 2(a)(3) applies to his situation. In this regard, he relies heavily on the legislative history of this provision.

As initially proposed in H.R. 2498, 81st Cong., 1st Sess., Article 2(3) would have established military jurisdiction over "Reserve personnel who are voluntarily on inactive duty training authorized by written orders." Hearings on H.R. 2498 Before a Subcomm. of the House Committee on Armed Services, 81st Cong., 1st Sess. 567 [hereafter cited as House Hearings], *reprinted in Index and Legislative History, Uniform Code of Military Justice.* In explaining this language during Hearings by the House Armed Services Committee on the Uniform Code, Mr. Smart noted:

> Paragraph (3) is adapted from 34 U.S.C., section 855. The requirement that there be written orders is added for two reasons. First, the applicability of this code to personnel on inactive-duty training is desirable only with respect to certain types of training, such as weekend flight training, and the written orders will be used to distinguish the types.

Secondly, the orders will be notice to the personnel concerned.

House Hearings, *supra* at 853–54.

The Senate Committee reported on this language as follows:

> Subdivision 3, article 2, was objected to by Reserve associations on the ground that it would be used to subject Reserves to the code when they are engaged in all types of inactive duty training. *Although the committee has made no change in this subdivision, it desires to express the view that military departments should issue orders subjecting Reserves to the code only when they are engaged in inactive duty training involving the use of dangerous or expensive equipment.*

S.Rep. No. 486, 81st Cong., 1st Sess. 4–5 (1949) (emphasis added), *reprinted in Index and Legislative History, supra.*

Subsequently, the proposed language of subsection (3) was modified to provide jurisdiction over "Reserve personnel while they are on inactive duty training authorized by written orders which are voluntarily accepted by them, which orders specify that they are subject to this code." House Hearings, *supra* at 1261. Regarding this provision, Professor Morgan, who chaired the Committee that drafted the Uniform Code, said:

> The only part of that, Senator, where we have expanded it that I should feel very strongly about, is this case of Reserve officers on inactive training under orders which state specifically that if they accept it they will be subject to the code, and that is to take care of these fellows who practice flying. When they buzz places, and so forth, and they are in charge of very expensive equipment, they certainly ought not to be allowed to use that very expensive equipment for training unless they are doing it under the terms of orders affecting regular members of the corps. It seems to me that is the case. They do not have to do it if they do not want to. They do not have to accept it.

Hearings on H.R. 4080 Before a Subcomm. of the Senate Armed Services Committee, 81st Cong., 1st Sess. 327 (1949), *reprinted in Index and Legislative History, supra.*

Senator Kefauver, from the Committee on Armed Services, submitted this sectional analysis of Article 2(3) in his Senate Report:

> Paragraph (3) is adapted from 34 U.S.C., section 855. It makes the code applicable to a person on inactive duty training, *but only if he has voluntarily undertaken the training after notice that he will be subject to the code. This paragraph is intended to afford control over persons on inactive duty training involving the use of dangerous or expensive equipment—such as week-end flight training.*

S.Rep. No. 486, *supra* at 7 (emphasis added).

Some other discussion during the legislative hearings illuminates the congressional intent and appears in Appendix B to this opinion.

The legislative hearings make clear that, prior to the Code, the Navy had a more expansive view of jurisdiction over reservists than did the Army and the Air Force. In light of concerns expressed by various witnesses, Congress did not wish to go so far in authorizing military jurisdiction over reservists as the Navy might have preferred. However, because of legislative concerns about "weekend warriors" who were handling expensive and dangerous equipment, the proposed Article 2(3) was not deleted from the Code.

Probably, the "regularly scheduled inactive training duty"[6] for which Caputo reported on March 12, 1983, was not the type of duty which Congress had in mind when Article 2(a)(3) was enacted. The record does not reveal whether his usually scheduled training duty would have involved use of expensive or dangerous equipment. However, even if the Navy were seeking to invoke Article 2(a)(3) for purposes and under circumstances not contemplated during

the 1949 hearings on the Code, we doubt that Congress intended for this Court—or an Article III Court—to decide whether various military duties performed by inactive reservists for training were among those mentioned in the hearings. Indeed, that type of inquiry would lead us into the sort of thicket which courts have traditionally sought to avoid. *Cf. Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). In short, Congress relied on the good faith of military authorities and on the political process to prevent excessive use of the power conferred by Article 2(a)(3); so if Caputo's situation falls within the letter of this statutory provision, we shall not seek to determine whether it conforms to the spirit of the legislation.

■ We perceive no constitutional problem with Article 2(a)(3), even when construed literally as the Government desires. Contrary to Caputo's position, a reservist is not in every respect a civilian. Instead, by joining the Reserve Forces, he assumes special obligations—such as to train himself and to be prepared for extended active duty. In recent years, the armed services have relied more and more on reservists as part of a "total force." To some extent, this increased reliance reflects budgetary constraints which limit the number of active duty military personnel. Also, it reflects the continued vitality of the tradition of the citizen-soldier who, like Cincinnatus, leaves his civilian pursuits and takes up arms for his country in time of peril.

In line with the "total force" concept, the training assignments of reservists have been integrated more closely with the assignments of active-duty personnel. For example, during the Vietnam War, reservists often flew transport planes to Southeast Asia; and they are still used extensively for military transport responsibilities. Although the rationale for such activity may be "on-the-job training," the reservists who perform such duties are also rendering valuable service to the armed

---

**6.** Memorandum of Decision by Judge Haldeman      dated June 1, 1983, p. 2.

forces; and, in doing so, they often are in control of expensive and hazardous equipment, such as ships, airplanes, and tanks. In view of the current role of reservists in our Nation's defense, we have no doubt that Article 2(a)(3) falls within the congressional power "[t]o make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cl. 14.

■ Moreover, Caputo's argument that personal jurisdiction cannot be created by consent misses the mark in the present context. Military jurisdiction typically derives from consent, in that it usually depends on the existence of a status which is created by consent. In today's All-Volunteer Force, *every* servicemember is an enlistee who is subject to military jurisdiction only because he has voluntarily entered an enlistment contract which created a military status. *Cf. In re Grimley*, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890). A reservist who is called to active duty for training may not have contracted for a particular tour of duty, but he has initially enlisted in the Reserve and thereby voluntarily created an inchoate military status. Thus, Congress did not spawn an anomaly when Article 2(a)(3) authorized military jurisdiction over offenses committed by a reservist performing inactive duty pursuant to voluntarily accepted written orders which specify that the recipient of the orders will be subject to the Uniform Code of Military Justice.

Admittedly, the "orders" to Caputo may not comply with the language of Article 2(a)(3). Although the document is captioned "Enlisted Application and Orders," it only purports to assign Caputo in pay status to an organization, but does not direct the performance of a specific duty. *See* Appendix A. Instead, it states that "[w]hen directed by appropriate authority," he will report to his "assigned drilling unit." The "direction" by appropriate authority may itself be the "orders," which under Article 2(a)(3) must be in writing, specify that the recipient is subject to the Uniform Code, and be voluntarily accepted.

However, in light of our unfamiliarity with personnel administration in naval reserve units, we choose not to explore that issue at this time, because personal jurisdiction over Caputo is lacking for another reason.

## IV

■ Paragraph 11*a*, Manual, *supra*, states:

The general rule is that court-martial jurisdiction over commissioned officers, cadets, midshipmen, warrant officers, enlisted members and other persons subject to the code ceases on discharge from the service or other termination of that status *and that jurisdiction as to an offense committed during a period of service or status thus terminated is not revived by re-entry into the military service or return into such a status.*

(Emphasis added.) This "rule" conforms to the Supreme Court's decision in *United States ex rel. Hirshberg v. Cooke, supra*; *see also United States v. Brown*, 12 U.S.C. M.A. 693, 31 C.M.R. 279 (1962).

At the time of the alleged offenses in Hawaii, Caputo was in a status which under the Code subjected him to military jurisdiction. *See* Art. 2(a)(1). That status terminated by his release from active duty for training. Subsequently, on March 12, 1983, Caputo was again in a status in which, according to the Government, he was subject to military jurisdiction. *See* Art. 2(a)(3). However, even if this premise is correct, the hiatus that occurred in appellant's status of being subject to the Code precludes trial by court-martial, unless an exception to the "general rule" applies.

■ According to paragraph 11*b*, Manual, *supra*, there are "some exceptions which include" several that it discusses. For example, when no interruption occurs in the accused's "status as a person belonging to the general category of persons subject to the code, court-martial jurisdiction over him does not terminate." *See also United States v. Clardy*, 13 M.J. 308 (C.M.A. 1982). However, in the present case there *was* an interruption: from Feb-

ruary 18, 1983—when he was detached from active duty training—until March 12, 1983—when he "reported for regularly scheduled inactive training duty"[7]—Caputo was not "a person belonging to the general category of persons subject to the code."

Another "exception" discussed in paragraph 11*b* is created by Article 3(a) of the Uniform Code, 10 U.S.C. § 803(a). Thus, if a servicemember commits a violation of the Code, then severs all connection with the military and is in a civilian status but later reenters the armed forces or otherwise becomes subject to the Code, he may be court-martialed for his crime, if the requirements of Article 3(a) are met. This exception was utilized to uphold military jurisdiction in *United States v. Wheeler*, 10 U.S.C. M.A. 646, 28 C.M.R. 212 (1959), and *United States v. Gallagher*, 7 U.S.C.M.A. 506, 22 C.M.R. 296 (1957).

Article 3(a) requires that the offense be one (a) for which confinement for 5 years or more is authorized by the Code *and* (b) "for which the ... [accused] cannot be tried in the courts of the United States or of a State, a Territory, or the District of Columbia." Thus, the "exception" to the "general rule" cannot be utilized in the present case, because the principal offense alleged—which involved possession of LSD—clearly could have been tried in the state courts of Hawaii.

In *United States v. Schuering, supra,* the Court was confronted with a larceny of government property committed by a Marine reservist during a weekend drill and discovered during that same period, but not prosecuted until a subsequent tour of duty. Chief Judge Quinn noted that under the Naval Reserve Act of 1938, 52 Stat. 1180, § 301, 34 U.S.C. (1946 ed.) § 855, " 'disciplinary action for an offense committed' in one drill or training period 'shall not be barred by reason of release from duty status.' [Citation omitted.] There was no indication as to the kind of offense that could be prosecuted on the accused's reacquisition of a military status." According to

Chief Judge Quinn, nothing in the Uniform Code established "a restriction on the general rule that a court has jurisdiction to try a person then subject to its jurisdiction for an offense committed by him at the time the court had jurisdiction over both the offense and his person." Furthermore, "in each period of training duty the accused is liable to trial by court-martial for an offense committed by him when subject to military law, without regard to the provisions of Article 3(a), and subject only to the statute of limitations for the offense charged." 16 U.S.C.M.A. at 328, 36 C.M.R. at 484.

However, these observations by Chief Judge Quinn were dicta. Neither of the other two judges joined in his opinion, although they concurred in setting aside the findings of guilty and dismissing the charges. Moreover, Chief Judge Quinn did not deal with the effect of the "general rule"—which was expressed in paragraph 11*a* of the Manual for Courts-Martial, United States, 1951, in the very terms in which it now is stated in the same paragraph of the 1969 Manual. Therefore, we conclude that none of the paragraph 11*b* exceptions precludes application of the general rule set out in paragraph 11*a*.

## V

If the offenses with which Caputo was charged fell within the purview of Article 3(a) of the Uniform Code, a different result might obtain—at least assuming that on March 12, 1983, he was in the category of persons described by Article 2(a)(3) of the Code. Even under those circumstances some practical problems might exist in trying him while he was in an "extended" inactive duty status for training purposes. Indeed, Congress may wish to consider whether express authority should be granted for the Armed Services to order a reservist to active duty for purposes of court-martial with respect to an offense that has occurred during an earlier period of mili-

7. *Id.*

tary service and which falls within the purview of Article 3(a).[8] However, under existing law and on the facts of the present case, personal jurisdiction over appellant is lacking.[9]

The petition for extraordinary relief is granted, and the charges are dismissed.

Judge FLETCHER concurs.

## APPENDIX A

ENLISTED APPLICATION AND ORDERS
TO A NAVAL RESERVE UNIT (NON-EDIGOR)
NAVPERS 1326/14 (Rev. 9-75) S/N 0105-LF-013-2670

### PRIVACY ACT STATEMENT

Authority to request this information is derived from 5 United States Code 301, Departmental Regulations. Purpose of this form is to permit an individual to apply for assignment to a Naval Reserve drilling unit. The information is used to evaluate individual's request for assignment to a drilling unit and to notify him/her of that decision. Form becomes a part of the individual's personnel record. Completion of this form is mandatory. Failure to provide required information may result in an inability to process this application.

| NAME (last, first, middle) | SSN | RATE | EXP. OBL. SERV. |
|---|---|---|---|
| CAPUTO, MARTIN NMN | 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 | SK3 | 12 JUNE 1980 |

| PRESENT ADDRESS (Street, and Number, City, State and Zip Code) | SERVICE RECORD HOLDER |
|---|---|
| 152 HYLAN BLVD. STATEN ISLAND, NY 10305 | NMPC WASHINGTON, DC |

| DATE RELEASED FROM ACTIVE DUTY | LAST SHIP OR STATION | DATE OF BIRTH |
|---|---|---|
| 4 AUGUST 1978 | USS HUXLEY AS-31 | 30 MARCH 1954 |

I hereby request Inactive Duty Training orders for assignment in: ☐ Drill Pay Status ☐ Non-pay Status
To: (Name and Mailing address of Unit, Including APC)

NR CH3 & DET B, NAVRESCEN, FORT WADSWORTH, STATEN ISLAND, NY 10305

I understand that issuance of orders as a result of this request is contingent upon my eligibility for assignment based on current directives. Information subsequently received which indicates otherwise will be cause for termination.

I have been examined and found physically qualified within the past year and I hereby certify that to the best of my knowledge there has been no material change in physical condition since that examination.

I understand I am required to promptly notify my Commanding Officer of any change in my physical condition.

I certify ☐ I am ☒ I am not drawing a pension, retired pay, or disability compensation from the United States Government for prior military service, and that ☐ I have, ☒ I have not a claim pending for any of the aforementioned types of compensation.

☒ I am enclosing NAVPERS 1200/1 requesting transfer to/retention in the Ready, Reserve

☐ I am a member of the Ready Reserve until _____
(Date)

I understand that I am required to participate satisfactorily for the duration of my enlistment or a minimum of one year, provided I am eligible in all respects. I further understand that satisfactory participation consists of a minimum of 90 per cent drill attendance and/or the performance of annual active duty for training as required by my assigned training category.

I understand that my training category is _____A_____ and that I am required to perform _____48_____ drills and _____14_____ days active duty for training annually.

I understand that if I request to terminate this assignment, the date approved for termination may not be less than 12 months from the date of the request, except in case of transfer to another unit, or extreme personal or community hardship, as defined in BUPERSMAN.

I am available for immediate active duty in event of war or national emergency declared by Congress or the President or otherwise authorized by law and am subject to mobilization with the above unit, or individually from the date of this request.

| DATE | SIGNATURE OF APPLICANT |
|---|---|
| 13 JUNE 1982 | *Martin Caputo* |

From: Commanding Officer NAVRESCEN, FORT WADSWORTH, STATEN ISLAND, NY 10305
To: The above named reservist

1. ☒ Returned, approved. You are assigned to __NR CH3 & DET B__ in a __DRILL PAY__ status effective 13 JUNE 1982. You are advised that computation toward satisfactory participation commences on the effective date of assignment. Your records are maintained by the unit to which you are assigned. When directed by appropriate authority; or upon announcement via radio, other news media, or other means, report on M-Day (or as otherwise directed) to your assigned drilling unit.

2. ☐ Disapproved, because:

| DATE | SIGNATURE |
|---|---|
| 13 JUNE 1982 | *(signature)* CSC ROBERT H. ABBOTT, BY DIRECTION |

I accept the foregoing assignment fully understanding that while engaged in training pursuant thereto I shall be subject to the provisions of the Uniform Code of Military Justice.

| DATE | SIGNATURE OF RESERVIST |
|---|---|
| 13 JUNE 1982 | *Martin Caputo* |

**8.** *United States v. Schuering*, 16 U.S.C.M.A. 324, 36 C.M.R. 480 (1966), and *United States v. Wheeler*, 10 U.S.C.M.A. 646, 28 C.M.R. 212 (1959), presented issues as to the validity of ordering a reservist to active duty when a primary purpose of the active duty would be to allow his court-martial for prior violations of the Uniform Code. Appellate government counsel conceded at oral argument that there is no authority to order Caputo to active duty for purposes of a trial by court-martial.

**9.** Caputo was performing active duty as a reservist when the alleged drug offense was com-

## APPENDIX B

"Mr. Galusha. I think, as I recall the testimony on that, Senator, most of the Reserve officers felt that the Regular services are going to put out orders, all their orders, requiring that they are subject to military law, and in talking with the Regular services, I think it is their intent to use that rather mildly, not to make them subject to court-martial every time they go to a training drill, and it is only in those cases where these people are on inactive-duty training, where they are handling expensive equipment, such as Professor Morgan stated, taking up planes, and so forth, that this will affect them.

Professor Morgan. As a matter of fact, the Army practically said they would not use it at all.

Mr. Larkin. This is right.

Professor Morgan. They said they were not going to use it. The Navy said they might use it if the fellow is put in charge of a ship.

Senator Kefauver. How can we make this a little more amenable? Does this refer also to National Guard men when they go down—

Professor Morgan. If they come into the Federal service.

Senator Kefauver. No; I mean when they go to their weekly meetings.

Mr. Larkin. No.

Professor Morgan. Only when they are in Federal service.

Senator Kefauver. Why not?

Mr. Galusha. They are not in Federal service.

Senator Kefauver. They are, too, if they are "on inactive duty training authorized by written order."

Professor Morgan. They never have to take the training if they do not want to.

Senator Kefauver. What is this about this that ties them up for 3 years?

Mr. Haydock. That is article 3.

Mr. Larkin. Well, you can tie it in this way: The history of this, just for a minute again, is that the Army has never had this, and the Navy has had this on the books not in the Articles of Government for the Navy, but in the United States Statute, a provision which is very much broader than this, and the Navy now does have jurisdiction over their Reserve personnel on inactive duty, or inactive duty training, when they are wearing their uniforms, when they are taking correspondence courses, when they are attending these monthly meetings, and almost in every circumstance.

Professor Morgan. Whenever they have got their uniform on.

Mr. Larkin. For the record, I would like to read section 855 of 34 United States Code, which is that provision for the Navy. Now, this is a substantial dilution of the Navy's jurisdiction, and in the same breath is granting jurisdiction to the Army that they have never had before. It is the middle ground, if you will, and was intended by the committee to cover—

Senator Saltonstall. What is the regulation in the Navy now?

Mr. Larkin (reading):

All members of the Naval Reserve who are employed on active duty, authorized training duty with or without pay, drill, or other equivalent instruction or duty, or when employed in authorized travel to or from duty, or appropriate duty, drill, or instruction, or during such time as they may, by law, be required to perform active duty, or while wearing a uniform prescribed for the Naval Reserves, shall be subject to the laws, regulations, and orders for the government of the Navy.

Now, under the provision in question, they are not subject to this code if they are

mitted. We do not quarrel with Judge Haldeman's conclusion that subject-matter jurisdiction existed. *United States v. Trottier*, 9 M.J. 337 (C.M.A.1980).

wearing a uniform or if they come to a monthly meeting, or if they are taking a correspondence course at home.

Professor Morgan. Or parading or something of that sort.

Mr. Larkin. They are subject here only when they get specific written orders which state in them that they are subject to the code, and they voluntarily accept them and come on for week ends in active duty training, wherein they are using the heavy, expensive equipment.

Senator Saltonstall. Read that again.

Mr. Larkin (reading):

All members of the Navy Reserve when employed on active duty—

and, of course, that is true of everybody all the time, and that is not this—

authorized training duty—

that would be inactive duty—

with or without pay, drill, or other equivalent instruction—

that would be when they take a correspondence course at home—

or duty or when employed in authorized travel to or from such duty or appropriate duty drill or instruction or during such times as they may, by law, be required to perform active duty, or while wearing a uniform prescribed for the Naval Reserves shall be subject * * *

Now, that is extremely broad, as compared to this which cuts down the Navy's jurisdiction.

The Reserves have claimed that this is to be read in as broad a sense as this previous Navy article, and they are apprehensive about it. When I say "Reserves" I mean the Army and Air Force; the Navy Reserves are already subject to the very broad provision I read. The witnesses claim it will deleteriously affect the activity of the Reserves, and that men are not anxious to subject themselves to it, and I say in that connection the Naval Reserve is probably the most active and the best Reserve of any of the armed services, even though they are subject to a much broader jurisdiction than is provided here.

Now, we have tried in the House hearings and in the commentary that we wrote to this bill to make it perfectly clear that the legislative intent of this provision is not to apply when they wear uniforms and when they go to monthly meetings, but it is only to cover the week-end flight duty, and other sea duty on shipboard, when the man has appropriate notice that he is subject to it, when he voluntarily accepts it, and under no other circumstances.

Now, they do not cut orders of that kind, and give them those written orders when they come to those monthly meetings, and when they go to parades.

Senator Kefauver. Mr. Larkin, is it possible to put a "provided" after the word "code" to say that the order should only specify that they are subject to the code in these particular circumstances you are talking about?

Mr. Larkin: I think maybe we could clarify it more, and make it even tighter than it is, so that everybody is completely reassured. Maybe we could put in here that this shall not cover the mere wearing of the uniform, correspondence courses, or perfunctory meetings, or things of that character. Maybe we could do that.

\* \* \* \* \* \*

Senator Kefauver. Would it be satisfactory to ask Mr. Galusha to study this further with Professor Morgan and the Reserve Officers Association and see if we can alleviate some of their fears anyway?

Professor Morgan. Senator, as far as I am concerned, you can cut down the military jurisdiction as much as you want to, except in this case where they are actually doing things that may really affect the service and/or civilians, this use of equipment, and so on and so forth; that is the only thing about that that I care about.

Senator Kefauver. If we could put in there that they should not be subjected to the code unless they are going to handle vehicles or airplanes and what not—

Mr. Larkin. That, I think, is a good suggestion.

Senator Kefauver. That is just spelled out as to what the Army now does.

Mr. Larkin. I think so. I think that would allay their fears. That is all that is intended.

The trouble springs from the fact that in here—

Senator Kefauver. What might be done.

Mr. Larkin. This is not concrete and tangible enough."

Hearings on H.R. 4080 Before a Subcomm. of the Senate Armed Services Committee, 81st Cong., 1st Sess., 327–29, 331 (1949), *reprinted in Index and Legislative History, Uniform Code of Military Justice.*

"Mr. Oliver. ... I think, as I stated in my formal statement, that when the Reserve officer is on active duty he should be exactly subject to the Articles of War the same as anyone else. But when he is on inactive-duty status, I do not believe he should be subject to the Articles of War.

Senator Saltonstall. If it is not out of place, Mr. Chairman, I would like to ask Mr. Larkin why that was included.

Mr. Larkin. Would you care for me to answer at this time, Mr. Chairman?

Senator Kefauver. Yes.

Mr. Larkin. That was included, Senator Saltonstall, after consideration of present Army and Navy practice which differs widely.

At the present time, the Army and the Air Force, as a matter of fact, have no statutory provision which gives any court-martial jurisdiction over Reserves while on inactive duty.

The Navy, on the other hand, at the present time has statutory provision which gives them very broad and wide jurisdiction over Reserves on inactive duty in any number of situations, not only when they are on inactive-duty training, where they come and take week-end flying training, and things of that character, but as far as the Navy coverage is concerned now, they are under the jurisdiction of the Articles for the Government of the Navy, even when they wear their uniform, when they take correspondence courses, they meet, as Colonel Maas said, and pointed out this morning, so that we have a complete extreme practice in the different services.

The committee therefore attempted to reevaluate that whole situation, and they decided on this provision which, according to the annotation and explanation provided by the committee was intended to cover the Reserves on inactive duty, when they come in for training, however, and not when they are merely wearing their uniform or taking a correspondence course or any of the other incidental circumstances, and they may find themselves in, as now covered by the Navy.

Senator Saltonstall. In my interpretation in the case that I put the hypothetical question, of a man coming out of his house and having an assault committed—committing an assault, or something, on a private street, and so on, would not under your interpretation come within this meaning of this act?

Mr. Larkin. If I can add several facts to it, I may be able to elaborate what was the intended meaning of this. It was intended then to cover persons on this inactive-duty training over the week ends, principally Reserves who come in and are using heavy expensive equipment, such as aircraft and ships, and things of that character, and not to cover the other incidentals, and to assure that it was done on a voluntary basis, and to assure these Reservists that they would understand what they were doing, because they cannot be called in mandatorily in that fashion, these provisions were set forth that they be given written orders specifically calling them, which they voluntarily accept, and which are set forth in such a way that they become subject to the articles.

If they do not desire to do so, why, of course, they do not come in. They have this notice.

Now, if a man comes in on that kind of training, voluntarily coming in, having had the written orders and having been notified of his being subject to the code, and he commits an offense while on that status

thereafter he may or may not, it may or may not be possible to bring him back for trial, depending on the provisions of article 3(a).

Very briefly, you cannot bring him back for trial after this training period if his case can be tried in the Federal courts. If it happens to be an offense, however, which is peculiarly military, and which the Federal courts have no jurisdiction over, and which is an offense which calls for more than 5 years' penalty, then you could bring him back thereafter, otherwise you could not.

Senator Saltonstall. So that there is considerable merit to Colonel Oliver's suggestion that the provision be stricken out.

Mr. Larkin. On the contrary, I would say Colonel Oliver's fears, I think they are not borne out, or we do not feel and did not intend that this would cover the situations that he contemplates, or Colonel Maas contemplated.

It was a very restrictive provision, and the House, to make sure it was clearly understood, added this additional language which set forth exactly the same idea, but it amounts to an extension of authority over reserves as far as the Army is concerned, and a great dilution of authority as far as the Navy is concerned.

Senator Saltonstall. Thank you."

*Id.* at 154–55.

"Technically speaking, Reserve personnel in uniform or even when taking a correspondence course would have been subject to the jurisdiction of this code. While we do not feel that the armed forces desired such wide latitude, we were unanimous in the decision that the jurisdiction should be limited by statute and not left to regulations. Therefore, we substituted an entirely new subdivision which we feel is entirely proper. You will note that Reserve personnel do not become subject to this code when on inactive duty training unless such training is pursuant to written orders which are voluntarily accepted and which specifically state that the acceptance of such orders will subject that particular Reserve to the provisions of this code."

H. Rep. No. 491, 81st Cong., 1st Sess. 4–5 (1949), *reprinted in Index and Legislative History, supra.*

"Colonel Wiener: There is a point in article 2 (3) of this bill, on page 4, jurisdiction over Reserve personnel who are voluntarily on inactive duty training authorized by written order. Well, in the first place, from the Army point of view, that is rather unclear because normally inactive duty training doesn't contain written orders. But I think there is a more serious and more fundamental objection to it. I don't think it is necessary; and I don't think it is very practicable.

If you have a Reserve officer on inactive duty—of course, if he is on active duty, he is like a regular officer for all disciplinary purposes—if you have him on inactive duty, and he commits something which would be a civil offense, such as larceny of Government property, you can deal with him much more expeditiously and easily in the appropriate civil tribunal. On the other hand, if he commits a military offense, or shows he is a pretty worthless fellow and had better get out of the Reserve, then I think you do better to board him, revoke his commission after having appeared before a board, instead of starting the somewhat cumbersome machinery going."

Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Committee, 81st Cong., 1st Sess. 799–800 (1949), *reprinted in Index and Legislative History, supra.*

"Mr. DeGraffenried. As I understand, you feel this, as one of your objections to this bill: You feel that the Reserve officers on inactive list should not come within the operation of this bill; is that correct?

Mr. King. That is right, sir.

Mr. DeGraffenried. Is that the thought you had?

Mr. King. Yes, sir.

Mr. DeGraffenried. They should not come within the operations of the bill.

Mr. King. That is right.

Mr. DeGraffenried. That they should really be subject to civil authorities only.

Mr. King. That is right.

Mr. DeGraffenried. Just as any other civilian?

Mr. King. I think, though, that the military service has a very definite system by which a Reserve officer on inactive status can be properly taken care of, and that is by a board of fitness which they have at this time, and they can throw him out if he is not a proper person to be in there.

Mr. DeGraffenried. But for any offenses that he commits, any alleged offenses that he commits that might not go to that extent, for him to be thrown out, do you think he should be tried before a civilian tribunal as any other civilian?

Mr. King. That is right, sir.

Mr. Brooks. Suppose you have this case. Say a Reserve officer over the week end takes a plane out in violation of the orders and regulations and there is a crack-up and someone is hurt. What would be your remedy there? Would it be by military or civilian court?

Mr. King. Mr. Chairman, it is a very simple thing for them and for the Department concerned to put him on active duty for 2 days for that period of time. He is drawing the pay for those 2 days. He is doing everything.

It is a question of how the order is written. And he has to volunteer for it in the first place. He can be put on active duty for 2 days or 1 day or indefinitely. It is a matter of just cutting an order.

Mr. Brooks. You would put him on active duty?

Mr. King. Certainly I would.

Mr. Brooks. For that time.

Mr. King. If he is going to perform a military duty, for a couple of days, and he ought to be in the service. But if he is going down here in the evening for 2 hours

of schooling or attending lecture, as we did the other night with Dr. Compton, are you going to charge a man with violation of the ninety-sixth article of war—the catch-all section—merely because he is late?

I think the proposition of a Reserve officer being subjected to courts-martial proceedings and being put on active duty pending his trial and taken away from his civilian occupation is an undue penalty in itself.

It would crucify most of them to be taken away from their civilian jobs for 10 days, 2 weeks, or 30 days pending the trial and the service of a sentence, whereas he can be thrown out if he is not a suitable officer."

*Id.* at 834–35.

"The draftsmen of this provision undoubtedly contemplated some particular type of duty such as "week-end flights." However, the provision is so loosely drawn, that it could include a situation where drill or other duties are provided for by written orders (especially since retirement credit and pay may be involved).

As drawn, it could conceivably include Reserve personnel voluntarily on inactive duty meeting once a month for a lecture, etc. and such personnel "talking back" to someone his superior.

I can't believe the draftsmen of this legislation intended to produce this result.

The bill should be amended to embrace clearly only those situations which were meant to be covered by this provision. If the provision was purposely drawn in a loose form, the members of this subcommittee should ponder deeply before recommending enactment of such a sweeping provision."

*Id.* at 817.

COOK, Senior Judge (dubitante):

The accused allegedly committed the offenses herein while on active duty for training and subject to the jurisdiction of the Uniform Code of Military Justice, Article 2(a)(1), 10 U.S.C. § 802(a)(1).[1] However, he

---

1. Article 2(a)(1), Uniform Code of Military Justice, 10 U.S.C. § 802(a)(1):

Members of a regular component of the armed force, including those awaiting dis-

was charged and brought to trial while undergoing inactive duty for training under the jurisdiction of Article 2(a)(3).[2] Both Codal sections are clear in the definition of "persons ... subject to this chapter." Since there is no ambiguity in the statutory language, the rules of statutory construction preclude resort to the legislative history for the purposes of clarification since there is nothing to clarify.[3] As the Court of Appeals for the Ninth Circuit said in response to a similar argument:

Article 2(3) contains no such limitations and we therefore do not deem it appropriate to search the legislative history on this matter. *See United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278 [1281], 6 L.Ed.2d 575 (1961); *United States v. McKesson & Robbins*, 351 U.S. 305, 315, 76 S.Ct. 937 [943], 100 L.Ed. 1209 (1956).

*Wallace v. Chafee*, 451 F.2d 1374, 1380 (1971), *cert. denied*, 409 U.S. 933, 93 S.Ct. 242, 34 L.Ed.2d 188 (1972).

I agree with the majority that the section is constitutional and clearly encompasses the accused.

Where I have doubts is in the reliance placed by the majority on paragraph 11*a*, Manual for Courts-Martial, United States, 1969 (Revised edition).[4] This paragraph appears to relate to the termination of active-duty service and the effect of such termination upon jurisdiction for offenses committed during the previously terminated tour of active duty. Hence, when it speaks of "discharge from the service or other termination of that status," it appears to mean

active-duty status which has been broken by a discharge or other termination of similar import. A reservist, on the other hand, remains a reservist before, during, and after periods of active or inactive duty for training. The only "status" that is changed relates to whether he is performing military duties as a reservist or is otherwise acting in his civilian role. Consequently, I have serious doubts whether paragraph 11*a* is a bar to jurisdiction over the accused and whether his reservist status is interrupted by "terminations" and "re-entries" when he is performing military reserve duties or not.

Adding to my doubts as to the correctness of the majority's interpretation of paragraph 11*a* is the fact that this language does not appear in the Manual for Courts-Martial, United States, 1984. Instead, it is replaced by the following:

Rule 202(a). *In general.* Courts-martial may try any person when authorized to do so under the code.

If the majority's interpretation is correct, the President, either through imprecision or inadvertence, previously limited the Codal grant of jurisdiction, and, now, for possibly the same reasons, has restored it. Obviously he can neither broaden nor narrow the jurisdiction conferred by Congress. Thus, we must assume that if paragraph 11*a* is the only bar to jurisdiction over the accused, that bar will be removed by August 1, 1984. And all of this will happen despite the fact that Article 2(a)(3) of the Code has not changed one whit during the

---

charge after expiration of their terms of enlistment; volunteers from the time of their muster or acceptance into the armed forces; inductees from the time of their actual induction into the armed forces; and other persons lawfully called or ordered into, or to duty in or for training in, the armed forces, from the dates when they are required by the terms of the call or order to obey it.

**2.** Article 2(a)(3):
Members of a reserve component while they are on inactive duty training authorized by written orders which are voluntarily accepted by them and which specify that they are subject to this chapter.

**3.** *See* 2A *Sutherland Statutory Construction*, Chapter 46 (C. Sands, 4th ed. 1973).

**4.** Paragraph 11*a*, Manual for Courts-Martial, United States, 1969 (Revised edition):
The general rule is that court-martial jurisdiction over commissioned officers, cadets, midshipmen, warrant officers, enlisted members and other persons subject to the code ceases on discharge from the service or other termination of that status and that jurisdiction as to an offense committed during a period of service or status thus terminated is not revived by re-entry into the military service or return into such a status.

last 24 years. Simple logic would seem to compel some other conclusion.

On the other hand, I am convinced that Congress in 1950 never considered the present amalgamation of the reserve forces into the total-force concept of today. I am not prepared to state categorically that congressional intent, even if unambiguous on its face, compels permitting the exercise of jurisdiction here. I therefore can only record my own doubts and misgivings and strongly urge Congress to clarify its intentions in this highly significant area of military law.